## SEUFERT v. OLNEY.

(Circuit Court, E. D. Washington, S. D. November 8, 1911.)

### No. 33.

INDIANS (§ 3*)—RIGHTS OF FISHERY—CONSTRUCTION OF TREATY.

Article 3 of the treaty with the Yakima Indians of June 9, 1855 (12 Stat. 952), which gives to such Indians the exclusive right of taking fish in all the streams where running through or bordering their reservation, "as also the right of taking fish at all usual and accustomed places, in common with citizens of the territory, and of erecting temporary buildings for curing them," secured to such Indians, away from their reservation, the right to their ancient fisheries which cannot be abrogated by state law, but apart from their "usual and accustomed places" their rights are the same as those of white citizens and may be enjoyed only in conformity with state regulations.

[Ed. Note.—For other cases, see Indians, Dec. Dig. § 3.*]

In Equity. Suit by Frank A. Seufert against George Olney. Decree for complainant.

Bennett & Sinnott, for complainant.

Oscar Cain, U. S. Atty., and E. C. Macdonald, Asst. U. S. Atty., for defendant.

RUDKIN, District Judge.   The complainant in this suit is the owner of certain uplands and shore lands lying along the north bank of the Columbia river in Klickitat county.   The uplands are held under patent from the United States, and the shore lands under deed or patent from the state of Washington.   The shore lands consist of an elliptical-shaped, sloping sand or gravel bar, the greater part of which is overflowed during several months of the year, but at ordinary or low stages of water in the river a considerable portion of the bar is exposed.   Commencing in the year 1893, the complainant, at considerable expense, removed the rocks and boulders from this bar with a view of catching salmon by seine in the river in front of his shore lands.   The method pursued by the complainant was as follows:

A seine, 500 or 600 feet in length and 30 feet in width, or depth, was anchored to a deadman planted in the bank above the water line. The body of the seine was then carried into the stream by a boat crew, at the point of a break between two currents, and the outer end was then borne around through the swift current to the shore line, where teams were attached and the seine drawn ashore.   The complainant fished in this manner under license from the state from 1893 until, the fall of 1908 without let or hindrance from any person, and, so far as the record discloses, without objection from any source.   In the month of August, 1908, the defendant, Olney, who is a half-breed Indian of the Yakima Tribe, under the charge of an Indian agent or superintendent, purchased a seine of like character to that used by the complainant, and repaired to the fishing ground theretofore occupied by the complainant, with a large force of men and teams, anchored his seine to the deadman planted by the complainant, and proceeded to fish the stream in the method theretofore pursued by the complainant, driving his teams over the complainant's shore lands and occupying them for that purpose.   The present suit was thereupon commenced in the superior court of Klickitat county for the purpose of enjoining the defendant from trespassing upon the complainant's property.   The defendant appeared by the United States attorney for the Eastern district of Washington, and the suit was removed into this court; the defendant asserting certain rights under the Indian treaty of June 9, 1855 (12 Stat. 951).   Issues were made up, a large volume of testimony has been taken before a commissioner, and the case is now presented for final decision.

Two questions are presented for consideration: First, what rights were reserved to the defendant by the treaty in question; and, second, have those rights been invaded by the complainant?

By article 1 of the treaty, the confederated tribes and bands of Indians ceded to the United States all the right, title, and interest in and to the lands then occupied and claimed by them.

By article 2 there was reserved from the lands thus ceded certain lands or reservations for the use and occupation of the Indians.

By article 3:

"The exclusive right of taking fish in all the streams where running through or bordering said reservation, is further secured to said confederated tribes and bands of Indians, as is also the right of taking fish at all usual and accustomed places, in common with citizens of the territory, and of erecting temporary buildings for curing them; together with the privilege of hunting, gathering roots and berries, and pasturing their horses and cattle upon open and unclaimed land."

In United States v. Taylor, 3 Wash. T. 88, 13 Pac. 333, involving a fishery in this same locality, it was held that the treaty reserved to the confederated tribes and bands of Indians the right to enjoy their ancient fisheries as they had done theretofore. This was in all probability the Indians' understanding of the reservation. They had already ceded away a continent; they were tenacious of their old customs and traditions; they lived in the past rather than in the present; and it is far more likely that they intended to reserve something they already understood, something they already enjoyed, rather than to bargain for something that they did not understand, and for which they did not care.

In United States v. Winans, 198 U. S. 371, 25 Sup. Ct. 662, 49 L. Ed. 1089, involving another fishery on the Columbia, the trial judge said:

"I find from the evidence that the defendants have excluded the Indians from their own lands, to which a perfect absolute title has been acquired from the United States government by patents, and they have more than once instituted legal proceedings against the Indians for trespassing, and the defendants have placed in the river in front of their lands fishing wheels for which licenses were granted to them by the state of Washington, and they claim the right to operate these fishing wheels, which necessitates the exclusive possession of the space occupied by the wheels. Otherwise the defendants have not molested the Indians nor threatened to do so. The Indians are at the present time on an equal footing with the citizens of the United States who have not acquired proprietary rights, and this it seems to me is all they can legally demand with respect to fishing privileges in waters outside the limits of Indian reservations under the terms of their treaty with the United States."

The Supreme Court held that these views were erroneous, and would entirely abrogate the treaty, saying:

"There was an exclusive right of fishing reserved within certain boundaries. There was a right outside of those boundaries reserved "in common with citizens of the territory.' As a mere right, it was not exclusive in the Indians. Citizens might share it, but the Indians were secured in its enjoyment by a special provision of means for its exercise. They were given 'the right of taking fish at all usual and accustomed places,' and the right 'of erecting temporary buildings for curing them.' The contingency of the future ownership of the lands, therefore, was foreseen and provided for; in other words, the Indians were given a right in the land—the right of crossing it to the river, the right to occupy it to the extent and for the purpose mentioned. No other conclusion would give effect to the treaty. And the right was intended to be continuing against the United States and its grantees as well as against the state and its grantees."

The court further held that this right could not be abrogated by state laws or state regulations. The court, however, was there speaking of ancient fisheries, "the right of taking fish at all usual and ac-

customed places"; and I am not aware that the government has ever asserted in behalf of the Indians the right to take fish at any other places, except in accordance with state laws. United States v. Taylor, supra; United States v. Alaska Packers' Ass'n (C. C.) 79 Fed. 152.

Indeed, the mere assertion of such a right outside of these accustomed places would be disastrous in the extreme. While by the common law all persons had a common and general right of fishing in the sea, and in all other public navigable waters, under modern methods and modern conditions that right cannot be enjoyed in common. Where fish are caught in fixed appliances, such as in wheels or in traps, the person maintaining the wheel or trap must necessarily have the exclusive possession of the ground or water occupied by his appliances. Such a right has uniformly been granted by licenses issued by the fish commissioner under the laws of this state, and it has never been claimed that the rights thus granted are subservient to the rights of the Indians. In my opinion, therefore, the true construction of the treaty is this: The Indians are granted certain fishing rights and privileges in their ancient and accustomed places, which they are entitled to enjoy under and by virtue of the treaty, and of which they cannot be deprived by state laws or state regulations. On the other hand, the treaty confers no rights upon them in other waters or in other places, and if they seek to fish there they must do so in conformity with the laws of the state, and on an equal footing with the rest of mankind.

Any extended review of the testimony in this case would serve no purpose. While from the necessities of the case the testimony on the part of the complainant is of a negative character, I am convinced from the entire record that the complainant's shore lands have never been a usual or accustomed fishing place for the Indians. The testimony abundantly shows that the Indians from time immemorial have fished, with dip nets and spears, on the rocks and shoals a few hundred yards above this point; but they never were accustomed to fish here. Certainly no such right had been asserted for 20 years prior to the commencement of this action, and I am convinced that the Indians never availed themselves of the right to fish in the waters of the river in front of these shore lands. I am therefore satisfied that the defendant has wrongfully invaded the private property rights of the complainant, and that the treaty upon which he relies is no warrant or justification for his act.

Having reached this conclusion, it is perhaps unnecessary to determine what, if any, rights the defendant may have to go upon these lands under the treaty. He never visited this fishery before, and was not seeking to enjoy the primitive rights of his ancestors while there. He belongs to another generation and in part to another race. Through the bounty of the government he and his family are possessed of broad acres, and have cattle and sheep on every reservation hillside. Fishing to him is not as indispensable as the air he breathes. He was not catching fish for his tribe or for his family, but for the

market and cannery. He was not attempting to fish at one of the usual or accustomed places, and he must therefore comply with the local laws and regulations of the state in which he lives.

Let a decree be entered accordingly.