Argued May 16, reversed in part and affirmed in part June 30, petition for rehearing denied August 29, 1950

## ANTHONY ET AL. *v.* VEATCH ET AL.
## COLUMBIA RIVER FISHERMEN'S PROTEC-
## TIVE UNION ET AL., Intervenors

220 P. (2d) 493
221 P. (2d) 575

*Thomas H. Ryan* argued the cause for appellants and cross respondents. On the brief were Anthony Pelay, Jr., and Ryan & Pelay, all of Portland.

*Cecil Quesseth,* Assistant Attorney General, argued

the cause for respondents and cross appellants. With him on the brief was George Neuner, Attorney General of Oregon, both of Salem.

*Ben Anderson* argued the cause for intervenors-respondents and cross appellants. On the brief were Anderson & Franklin, of Portland.

Before LUSK, Chief Justice, and BRAND, BELT, ROSSMAN, HAY, and LATOURETTE, Justices.

HAY, J.

Each of the plaintiffs in this case is the owner and operator of fishing appliances of the type commonly called "fixed gear", for the taking of salmon from the Columbia River, specifically, pound nets or fish traps. In this opinion, we shall refer to these persons either as "plaintiffs" or as "fixed-gear fishermen". They brought this action praying for a declaratory judgment declaring Chapter 3, Oregon Laws 1949, as adopted by the people of the state of Oregon through the initiative on November 2, 1948, to be unconstitutional.

The defendants are the members of the Fish Commission of the State of Oregon and the State Master Fish Warden. They will be referred to herein as "the Commission". Certain other persons, who are owners and operators of appliances for the taking of salmon in the Columbia River of the type called "floating gear", specifically, drift gill-nets, and an incorporated labor union whose members are gill-net fishermen in the Columbia River, intervened in the action by permission of the circuit court. These intervenors will be referred to herein as "the gill-netters".

The initiative act prohibited the taking of salmon, salmon trout or steelhead in any of the waters of the Columbia River or its tributaries in the state of Oregon by means of fixed gear, with the proviso that the act does not apply to fishing by Indians under Federal regulations or to the taking of fish for propagation or scientific purposes by the state or national governments.

The complaint alleges that the initiative act is unconstitutional in several respects which will be set forth specifically hereunder. The commission answered, contending that the act is a reasonable exercise of the police power of the state and is in all respects valid and constitutional. The gill-netters answered, alleging that the operation of the fishing gear of plaintiffs threatens an indiscriminate slaughter of anadromous fish in the Columbia River, regardless of size or species, and that, if plaintiffs are permitted to continue such fishing, the salmon runs of the Columbia River will in large measure be destroyed, to the irreparable damage of the gill-netters "and all persons who are engaged in lawfully taking fish in said waters." The plaintiffs replied to both answers by general denial.

After a hearing, the court, on November 21, 1949, entered a decree holding, in effect, as follows:

(1) That section 1 of the act is unconstitutional, in that such section goes beyond the scope of the title of the act by prohibiting the use of drag seines for any purpose whatever in the waters specified, whereas the title of the act defines its purpose in this connection to be only the prohibition of the use of drag seines for the taking of salmon in such waters.

(2) That section 3 is unconstitutional, in that it

goes beyond the scope of the title of the act by prohibiting the use of whip seines for any purpose whatever in said waters, whereas the title of the act defines its purpose in this connection to be only the prohibition of the use of whip seines for the taking of salmon in such waters.

(3) That section 2 is unconstitutional, in that it prohibits the taking of salmon, salmon trout or steelhead by means of fixed appliances, whereas the title of the act ''evidences an intention to limit the prohibition to the taking of salmon by such means.''

The remainder of the act was declared to be constitutional.

Plaintiffs appealed from the decree so far as it declared certain portions of the act to be constitutional. The Commission appealed from those parts of the decree which declared that portions of sections 1, 2, and 3 of the act were unconstitutional. The gill-netters appealed from those parts of the decree which declared that portions of the initiative act were unconstitutional.

Plaintiffs contend that the act herein attacked is an attempt to regulate fishing in the tidewaters of the Columbia River, a matter which is ''within the exclusive jurisdiction of the United States'', and that it is therefore unconstitutional. They cite no authority for such contention, but suggest that the rationale of *United States v. California,* 332 U. S. 19, 91 L. ed. 1889, 67 Sup. Ct. 1658, may hereafter be extended to bring such fishing within federal control, ''particularly for the social-economic reasons which often impel our present United States Supreme Court''.

The case in question was concerned only with whether the United States or the state had title to

marginal lands comprising the bed of coastal waters within a belt three miles in width beyond mean low-water mark of the California littoral. It was held that such title is in the United States. In argument, the government did not deny that California has "a qualified ownership of lands under inland navigable waters such as rivers, harbors, and even tidelands down to the low water mark", but did question the rationale of *Pollard v. Hagan*, 3 How. (U.S.) 212, 11 L. ed. 565, which held that ownership of such lands is a necessary incident of state sovereignty. As far as is material to the present discussion, the Pollard case decided (1) that the shores of navigable waters, and the soils under such waters, were not granted to the United States by the Constitution, and (2) that new states have the same rights, sovereignty, and jurisdiction over navigable waters within their borders as had the original states. The court reasoned that, at the time when this country won its independence from England, there was no general understanding among nations that each owned a marginal belt of lands beyond its foreshores. The individual colonies, when they became independent states, did not claim such right. Hence, while such right was not granted by the states to the United States, neither was it retained by the states. It was simply nonexistent. Some countries, it was noted, and particularly England, Spain, and Portugal, had made from time to time sweeping claims to dominion over wide expanses of ocean, (See Selden, Dominion or Ownership of the Sea, II, 459) but such claims are made no longer. However, the idea that a nation has right of dominion over a sort of *cordon sanitaire* beyond its foreshores has, in comparatively modern times, gained widespread acceptance. The three-mile

extent of such dominion has not been acceded to by all states, but it appears to have been asserted by the United States as early as about the year 1812. Jessup, The Law of Territorial Waters and Maritime Jurisdiction, 57.·

The Pollard case had to do with a title dispute over reclaimed lands in Mobile Bay. The bay was regarded as navigable tidewater, *intra fauces terrae,* title to the soil under which inhered in the state by virtue of its sovereignty. Cf. *Alsos v. Kendall,* 111 Or. 359, 369, 227 P. 886. Upon admission of a state into the Union, the title of the United States to lands underlying navigable waters within such state passes to the state, as an incident of "local sovereignty". *United States v. Oregon,* 295 U. S. 1, 79 L. ed. 1267, 1274, 55 Sup. Ct. 610; *Hume v. Rogue River Packing Co.,* 51 Or. 237, 246, 83 P. 391, 92 P. 1065, 96 P. 865; *Parker v. West Coast Packing Co.,* 17 Or. 510, 515, 21 P. 822; *Coquille Mill & Mercantile Co. v. Johnson,* 52 Or. 547, 549, 98 P. 132, 132 Am. St. Rep. 716; *Micelli v. Andrus,* 61 Or. 78, 84, 120 P. 737; *Atkinson v. State Tax Commission,* 156 Or. 461, 473, 62 P. 2d 13, 67 P. 2d 161, 303 U. S. 20, 82 L. ed. 621, 58 Sup. Ct. 419. The sovereignty of individual states of the Union over soils under navigable waters is not to be confused with the rights of dominion and regulation which the United States must of necessity and in self-protection exercise over the ocean and its bed within the marginal belt.

To the extent that ownership of inland navigable waters is concerned, the Pollard decision was not disturbed by *United States v. California,* supra. Indeed, the court was careful to say so, in a footnote, which, referring to the case of *United States v. Mission Rock*

*Co.,* 189 U. S. 391, 47 L. ed. 865, 23 Sup. Ct. 606, reads, in part, as follows:

"* * * The United States sued in ejectment for certain lands situated in San Francisco Bay. The defendant held the lands under a grant from California. This Court decided that the state grant was valid because the land under the Bay had passed to the state upon its admission to the Union * * * There may be other reasons why the judgment in that case does not bar this litigation; but it is a sufficient reason that this case involves land under the open sea, and not land under the inland waters of San Francisco Bay."

There is, in our opinion, no implication to be drawn from *United States v. California,* supra, that the rationale of that case might at some future time be extended so as to deprive a state of the right to regulate and control fishing within its own inland navigable waters. Cf. *Toomer v. Witsell,* 334 U. S. 385, 92 L. ed. 1460, 68 Sup. Ct. 1156.

■ The right of the state, either in the exercise of its police power, or in its sovereign capacity in trust for its people, to regulate and even to prohibit the capture of fish in navigable waters within its borders, has been asserted by this court, and is sustained by the weight of authority. *Monroe v. Withycombe,* 84 Or. 328, 334, 165 P. 227; *State v. Hume,* 52 Or. 1, 5, 6, 95 P. 808; 22 Am. Jur., Fish and Fisheries, section 34. Such right is, of course, subject to the valid exercise of any authority pertaining to the United States under the federal constitution, such as the authority to regulate commerce and navigation. *New York ex rel. Kennedy v. Becker,* 241 U. S. 556, 60 L. ed. 1166, 36 Sup. Ct. 705.

The regulation, protection, and preservation of fish within the boundary waters of the Columbia River

are under the concurrent jurisdiction of the states of Oregon and Washington, by virtue of a compact entered into between such states in the year 1915. See Ch. 188, sec. 20, Gen. Laws of Oregon, 1915; Ch. 31, sec. 116, Session Laws of Washington, 1915. Such compact was consented to and ratified by Congress in 1918. Ch. 47, 40 Stat. at L., 515; Fed. Stat. Anno. Supp. 1918, p. 179. Cf. *P. J. McGowan & Sons, Inc. v. Van Winkle,* D. C. Or., 21 F. 2d 76, 77, aff. 277 U. S. 574, 72 L. ed. 995, 48 Sup. Ct. 435; *Olin v. Kitzmiller,* 259 U. S. 260, 66 L. ed. 930, 933, 42 Sup. Ct. 510.

■■ It is suggested that there may be conflict between the state's right to regulate fishing in its inland navigable waters and the right of the United States to regulate commerce and navigation in the same waters. It is well established that there is no necessary conflict between those rights. *Manchester v. Massachusetts,* 139 U. S. 240, 262, 35 L. ed. 159, 11 Sup. Ct. 559. And, while it is true that no state may place any obstruction in or upon any navigable waters without Congressional permission (id.), that point is not involved herein. Cf. *Le Clair v. Swift,* 76 F. Supp. 729, 733.

Error is assigned upon failure of the court to hold that the act contravenes a "treaty" between the states of Oregon and Washington. The so-called treaty is the compact between the states, above referred to. Appellants, without actually saying so, imply that this compact is a treaty in the constitutional sense (Const. U. S., Art. VI), and, therefore, superior to any state law. They say in their brief:

"We call upon this Court at this time to effect the original purpose and spirit of this treaty which is still the law of the land and superior to the initiative act in question. * * *"

■ Of course, the compact was not a treaty. A treaty is a contract between independent nations. 63 C. J., Treaties, sec. 1. The individual states of the United States have no authority to enter into any treaty. Const. U. S., Art. I, sec. 10, subd. 1. The compact merely provided that laws "regulating, protecting, or preserving fish in the waters of the Columbia River, over which the States of Oregon and Washington have concurrent jurisdiction, or any other waters within either of said States, which would affect said concurrent jurisdiction, shall be made, changed, altered, and amended in whole or in part, only with the mutual consent and approbation of both States." (For a discussion of the history of the interstate compact, see Wollenberg, The Columbia River Fish Compact, 18 Ore. Law Review, 88.)

■ The initiative act under discussion merely prohibits the taking of salmon, salmon trout, or steelhead by means of certain "fixed appliances". It does not appear that such prohibition in any manner affects the concurrent jurisdiction of the state of Washington over the regulation and protection of fish in the Columbia River. On the contrary, in 1935 Washington, by initiative process, prohibited the use of fixed-gear appliances, and the Oregon act simply brings this state into line with Washington in that respect. That being so, the act does not violate either the letter or the spirit of the compact between the states. *Olin v. Kitzmiller,* C. C. A. 9, 268 F. 348, 349; *Union Fishermen's Co. v. Shoemaker,* 98 Or. 659, 678, 193 P. 476, 194 P. 854; *P. J. McGowan & Sons, Inc., v. Van Winkle,* supra (21 F. 2d 76, 77, aff. 277 U. S. 574, 72 L. ed. 995, 42 Sup. Ct. 435), *State ex rel. Gile v. Huse,* 183 Wash. 560, 49 P. 2d 25.

Another asserted ground of unconstitutionality is that the act is an attempt by Oregon to impair the obligation of its contract with the fixed-appliance fishermen, in violation of Art. I, sec. 10, subd. 1, Const. U. S. In this connection, the remarkable contention is made that licenses heretofore issued by the Commission to the fixed-appliance fishermen constituted the latter, under the licensing provisions of the Fish Code (sections 83-601 83-619, O.C.L.A.; ch. 308, Or. L. 1943), agents of the state for the catching of salmon. The restrictions imposed upon the licensees, as to location of fishing operations, maintenance of certain records, payment of fees, etc., have the effect, we are told, of making their licenses in effect contracts between them and the state, irrevocable as long as the licensees perform the conditions thereof. The argument is buttressed by the contention that the fishermen, on the faith of their licenses, were "required to make the expenditure of thousands of dollars in the erection of permanent gear", and that the state has benefited to the extent of thousands of dollars from the fishermen's catch. The theory is, apparently, that the licenses are, in effect, franchises, having been issued for the benefit of the public. The amended complaint refers to the licenses as contracts wherein the fixed-gear fishermen "were granted an irrevocable right and franchise." Indeed, that is the argument, although it is not supported in the brief by any citation of authority.

It has been said that the grantee of a franchise holds it as agent or trustee of the grantor. 26 C. J., Franchises, sec. 6, citing *Talcott v. Pine Grove,* 23 F. Cas., No. 13,735, aff. 19 Wall. (U.S.) 666, 22 L. ed. 227. Franchises are special privileges conferred by govern-

ment upon individuals, which do not belong, of common right, to the citizens of the country generally. 26 C. J., Franchises, sec. 1; *Elliott v. City of Eugene,* 135 Or. 108, 113, 294 P. 358. The right of fishing in the waters of the Columbia River is one common to all the citizens of Oregon. *Driscoll v. Berg,* 137 Or. 499, 506, 293 P. 586, 1 P. 2d 611. The licenses granted by the state to the fixed-gear fishermen were, therefore, not franchises. *Eagle Cliff Fishing Co. v. McGowan,* 70 Or. 1, 14, 137 P. 766; *Hume v. Rogue River Packing Co.,* supra (51 Or. 237, 259, 83 P. 391, 92 P. 1065, 96 P. 865); *Monroe v. Withycombe,* supra (84 Or. 328, 335, 165 P. 227); *State v. Blanchard,* 96 Or. 79, 87, 189 P. 421. Nor were such rights so protected by the constitution that they could not be taken away by legislative enactment. *Driscoll v. Berg,* supra, p. 508; *State v. Hals,* 90 Wash. 540, 156 P. 395. Such licenses are not even contracts. They create no vested rights. *Le Clair v. Swift,* supra (76 F. Supp. 729, 733.) The certificates of license issued to the fixed-gear fishermen for the year 1949 contained a warning that "no right or privilege, assumed or otherwise, shall be understood to have been conveyed" by the licenses "for the taking of salmon, salmon trout, or steelhead contrary to the provisions of the initiative measure" under discussion herein. We are of the opinion that whatever rights the fixed-gear fishermen may have held by virtue of licenses issued to them for 1949 or previous years, such rights were terminated by the adoption of the initiative act.

Plaintiffs say further that the act is unconstitutional in that (a) it is ambiguous, uncertain and self-contradictory; (b) it is misleading in the preamble, in that it proposes to prohibit certain types of salmon

fishing with fixed appliances, whereas it actually prohibits all fishing with fixed appliances; and (c) it fails to define a fish trap or pound net. They have made no argument in support of (a).

As to (b) it is true that the preamble speaks only of the taking of salmon, whereas, in the body of the act, the taking of salmon trout and steelhead is prohibited as well. "Salmon" is, to a certain extent, a generic term, and in a broad sense may be said to include other members of the family *Salmo*. Section 36, Ch. 105, General Laws of Oregon, 1921, codified as section 83-303, O. C. L. A., provides:

> "Wherever the word 'salmon' is used in any of the laws of Oregon, the same shall be deemed and held to include chinook, silversides, steelheads, bluebacks, sockeye and all anadromous species of salmon and trout, except as to steelheads in the waters of the Rogue river, where the said steelheads are classified as game fish."

Although the foregoing classification does not include by name all varieties of Pacific salmon, it does include in general all anadromous species of salmon and trout. "Anadromous", as applied to fishes, means "ascending rivers to spawn". Oxford Dict. "The genus *Salmo* is by far the most important [of the family Salmonidae], and includes the black-spotted fish generally known as salmon and trout." Ency. Britt., 14th ed., 19:889. Section 1, Ch. 438, Oregon Laws 1947, as amended by section 1, Ch. 444, Oregon Laws 1949, in placing upon the Commission the duty of protection, preservation, propagation, etc., of certain fishes, including salmon, specifically excepts "trout of all species, including steelhead trout", but it is not apparent that such exception has any effect upon the provisions of the initiative act under discussion.

In any event, even if the title was insufficient, the insufficiency was cured by the ballot title prepared by the Attorney General. We shall discuss this point further in connection with the cross appeal of the Commission.

■ ■ As for the failure of the act to define the terms "pound net" and "fish trap", the general rule is that, in the absence of legislative intent to the contrary, commercial terms, when used in a statute relating to trade or commerce, are presumed to have been used in their ordinary trade or commercial meaning. Sutherland, Statutory Construction, 3rd ed., Vol. 2, p. 442. The evidence in this case indicates that the Commission classified pound nets and fish traps as being the same type of appliance. The legislature, in 1929, apparently took the same view in enacting chapter 121, Laws of 1929, sec. 1 of which made it unlawful to operate any fish trap or pound net in certain of the waters of the Columbia River. This court gave an elaborate description of what we called a "pound net fish-trap" in *Monroe v. Withycombe,* supra (84 Or. 328, 331, 165 P. 227.) In the same case we defined gill nets and seines. Moreover, "pound net" is a term of such general acceptance as to be defined by lexicographers as "A fish trap consisting of a net or nets supported to form an enclosure with a narrow entrance". Webster. Having in view the purpose of the present act, we accept the lexicographers' definition of the meaning of the term as obviously sufficient, in the absence of a different statutory definition. 50 Am. Jur., Statutes, sec. 260.

Plaintiffs argue somewhat heatedly that the sponsors of the initiative bill used grossly misleading pictorial advertising in furtherance of the bill, depicting

a salmon caught in a bear trap. The evidence shows that the opponents of the bill countered this type of advertisement by depicting a housewife snared in a gill net. We do not understand, however, that plaintiffs claim that we should find the act invalid because of the type of advertising used by the sponsors.

It is true that fish wheels and fish scows, the operation of which is prohibited by the act, were already banned long before this act was initiated (Gen. Laws, 1927, Ch. 1), but it is no objection to the validity of an act that it covers subject matter of earlier legislation. If earlier and later statutes are in irreconcilable conflict, then the earlier must yield to the later by implied repeal. *Winslow v. Fleischner*, 112 Or. 23, 228 P. 101, 34 A. L. R. 826; 50 Am. Jur., Statutes, Sec. 543.

It is urged that the act is unconstitutional in that it grants a privilege and immunity to one class of citizens which it refuses to grant to citizens in general. Art. I, sec. 20, Oregon Constitution. The point is that it states that its provisions "do not apply to fishing by Indians under Federal regulations". Plaintiffs say that this exemption gives the Indians the right to fish anywhere on the Columbia River that they may desire, and that the fixed-gear fishermen might circumvent the law by hiring Indians to operate their fixed-gear appliances for them. They fear, moreover, that, under the act, if in the future Indians should decide to fish with fixed gear, they will be permitted to do so anywhere on the river, no matter where they formerly resided, or how they formerly fished, as long as they are under federal regulation. There is some evidence in the present case that Indians use some fixed-gear appliances in taking salmon in the Colum-

bia River at Celilo Falls, which undoubtedly was one of their most ancient fishing grounds, but no evidence that they use such gear at any other places on the river.

The state of Washington, in 1935, adopted an initiative law prohibiting the operation of pound nets or fish traps within the waters of that state. In *State ex rel. Campbell v. Case,* 182 Wash. 334, 47 P. 2d 24, the plaintiff, who was the owner of certain fish trap locations, and, prior to the adoption of the initiative act, had held annual pound net licenses under which he had fished with pound nets, had a very substantial investment in locations and fishing equipment, upon which he had paid the state a considerable sum in taxes. He brought suit to test the constitutionality of the act, his principal contention being that the act exempted from its provisions a class of citizens, namely, Indians under federal regulation, in violation of the appropriate provision of the state constitution and of the "equal protection" clause of the 14th Amendment to the federal constitution. The court held that reading into the law a legislative purpose to exempt a class of citizens from restrictions placed upon all other citizens could be justified only by language unmistakably indicating such purpose, which language it did not find in the act. We quote:

"Now considering the language of the exemption in the light of the purpose of the act as it is disclosed by its terms, we think the relative and qualifying phrase 'under Federal regulation' refers to the phrase 'fishing by Indians' as its antecedent, rather than to the single word 'Indians,' as contended by the relator. As we read the exemption, its manifest purpose is to save to the Indians, generally, using the term 'Indians' in its

historic sense, whatever rights they may yet retain to fish, under Federal regulation, in the waters of the state.''

■ Many of the provisions of the Washington initiative act are identical with those of the initiative act in question here. The provisions respecting fishing by Indians under federal regulations are identical in both acts. In view of that fact, the Commission suggests that we should adopt in that regard the decision of the Washington court in *State ex rel. Campbell v. Case,* supra. We do not decide whether we ought to do so or not, but we are of the opinion that we are bound, in any event, to interpret our own law in conformity with certain treaties which were entered into by the federal government with certain Indian ''nations'' prior to the admission of Oregon into the federal Union.

Of those treaties, that entered into in 1855 with a confederation called ''Tribes of Middle Oregon'' may be taken as an example, the others being similar in terms. Under that treaty, the Indians ceded to the United States all their right, title and interest in certain lands and country theretofore occupied and claimed by them, reserving therefrom a certain described tract which was to be set apart for their exclusive use and benefit as an Indian reservation. The treaty contained the following proviso:

''Provided, also, That the exclusive right of taking fish in the streams running through and bordering said reservation is hereby secured to said Indians; and at all other usual and accustomed stations, in common with citizens of the United States, and of erecting suitable houses for curing the same.''

In *United States v. Winans,* 198 U. S. 371, 49 L. ed. 1089, 25 Sup. Ct. 662, the government brought suit to enjoin defendants from obstructing certain Indians of the Yakima nation in the exercise of fishing rights and privileges in the Columbia River in the state of Washington, which rights they claimed under one of the above-mentioned treaties. The defendants contended that the words, "the right of taking fish at all usual and accustomed places, in common with the citizens of the Territory", conferred only such rights as any inhabitant of the territory or state would have. The government argued that, when the treaty was made, fishing places which were later acquired by the non-Indian defendants were a part of the Indian country, subject to occupancy by the Indians with all the rights that such occupancy gave, and that the object of the treaty was to limit the Indians to the occupancy of certain lands, and define their rights outside such lands. It was held that the treaty was not a grant of rights by the government to the Indians, but rather a grant of rights by the Indians to the government, with a reservation of those rights not granted. The rights reserved included an exclusive right of fishing within the boundaries of the Indian reservation, and a right of fishing, outside the reservation, in common with the citizens of the territory.

Until 1871, Indian tribes were recognized by the United States as possessing the attributes of nations to the extent, at least, that the federal government entered into treaties with them. 27 Am. Jur., Indians, sec. 9. A treaty with an Indian nation is given the same force and effect as one with a foreign nation. It becomes a part of the law of the land, and cannot be annulled either in effect or in operation by courts or

by state legislatures. Idem, sec. 10. Such a treaty, as between the high contracting parties, takes effect, in the absence of any provision to the contrary, from the time it is signed, and its subsequent ratification relates back to that date. 63 C. J., Treaties, sec. 21. Plaintiffs argue that, although the Indian treaties involved in this case were entered into prior to the admission of Oregon into the Union, yet, because they were not ratified by the senate until after the admission of Oregon into the Union, they are not binding upon Oregon. However, as the treaties are a part of the law of the land, this argument cannot be sustained.

In *Seufert v. Olney,* C. C., E. D. Washington, 193 F. 200, 203, the complainant was the owner of certain uplands and shore lands on the north bank of the Columbia River in Klickitat County, Washington. At considerable expense, he removed rocks and boulders from a portion of his shore lands, thus making it possible for him to take salmon from the river by operating a seine in front of such shore lands and landing it thereon. He fished in this manner, under license from the state, from 1893 until 1908, without interference by any person. In 1908, the defendant, a half-breed Indian of the Yakima Tribe, procured a seine similar to that used by the complainant, and trespassed therewith upon the fishing grounds theretofore used by the latter. Complainant brought suit to enjoin such trespass. The defendant sought to justify his acts in the premises by pleading the Yakima Indian treaty. Upon authority of *United States v. Winans,* supra (198 U.S. 371, 49 L. ed. 1089, 25 Sup. Ct. 662), the court held that, while the Yakima treaty reserved to the Indians "the right of taking fish at all usual and accustomed places, in common with citizens of the terri-

tory," nevertheless, except at such "usual and accustomed places", their rights were no greater than those of other persons, and their fishing should be done "in conformity with the laws of the state, and on an equal footing with the rest of mankind." It was held further that the owners of shore lands would not be permitted to use, at fishing places which, prior to the treaty with the Indians, had been "usual and accustomed places" from which the Indians fished, fishing devices of a type that necessitated for their use the exclusive possession of such fishing places.

In *Tulee v. State of Washington*, 315 U. S. 681, 86 L. ed. 1115, 62 Sup. Ct. 862, it was held that the state had the power to impose upon Indians equally with others restrictions of a regulatory nature concerning the time and manner of fishing outside of the Indian reservations, but that it did not have the power of requiring them to pay a license fee of a purely revenue-producing character. The Indian appellant in that case contended that the treaty gave him an unrestricted right to fish in the usual and accustomed places, free from state regulation of any kind. While the court held that this contention placed too broad an interpretation upon the treaty, nevertheless it thought that the imposition of a revenue-producing license fee upon Indians "as a charge for exercising the very right their ancestors intended to reserve" could not be reconciled with a fair construction of the treaty.

■ Plaintiffs insist that the Washington court has adopted an erroneous view of the nature of the state's rights in respect of the regulation of fishing in the navigable streams of the state, and that, for that reason, the Washington decisions are not entitled to any weight as authority. They refer particularly to *Vail v. Sea-*

*borg,* 120 Wash. 126, 207 P. 15, in which the court said that "the state through its Legislature has the same right of regulation and control of this property [food fish in the navigable waters of the state] that it has of any other state property." They call attention also to *State ex rel. Campbell v. Case,* supra (182 Wash. 334, 47 P. 2d 24), in which the court spoke of the state being the owner of the fish "in its waters in its proprietary right" as trustee for all the people and for the common good. Plaintiffs contend that Washington regards its ownership of fish in navigable waters, so far as fish, *ferae naturae,* can be said to be the subject of ownership, as being a right of proprietorship, a *jus privatum* rather than *jus publicum,* the latter being a right of sovereignty. However, despite some rather loose expressions in the two decisions referred to, we think that it is clear that the Washington court correctly understands that the state holds title to the fish in its sovereign capacity. In *Vail v. Seaborg,* supra, the court cites with approval, among other cases, *Portland Fish Co. v. Benson,* 56 Or. 147, 108 P. 122, and *Geer v. Connecticut,* 161 U. S. 519, 40 L. ed. 793, 16 Sup. Ct. 600, both of which hold that title to fish swimming free in the navigable waters of a state is in the state, in its sovereign capacity, in trust for all of its citizens. See also *State v. Tice,* 69 Wash. 403, 125 P. 168, 41 L. R. A., N.S., 469, in which the court said:

> "The fish in the waters of the state, and the game in its forests, belong to the people of the state, in their sovereign capacity, who, through their representatives, the legislature, have sole control thereof, and may permit or prohibit their taking."

In our opinion, the act does not, in the respect mentioned, grant to one class of citizens any privilege

or immunity which, upon the same terms, does not equally belong to all citizens.

In another connection, it is reiterated that the act grants to one class of citizens a privilege which, upon the same terms, is not equally available to all. Oregon Constitution, Art. I, sec. 20. The argument is that, in effect, the act grants to gill-net fishermen a monopoly of fishing in the Columbia River. Of course, if it does have such effect, and if its prohibition of fixed-gear fishing is not a reasonable exercise of the police power for the promotion of the general welfare of the community, it is inoperative and void. *Hume v. Rogue River Packing Co.,* supra (51 Or. 237, 259, 83 P. 391, 92 P. 1065, 96 P. 865); *City of Portland v. Meyer,* 32 Or. 368, 52 P. 21; *White v. Holman,* 44 Or. 180, 74 P. 933; *Eagle Cliff Fishing Co. v. McGowan,* supra (70 Or. 1, 15, 137 P. 766); *Lewis v. State,* 110 Ark. 204, 161 S. W. 154, 155; *State v. Wright,* 53 Or. 344, 100 P. 296, 21 L. R. A., N.S., 349; 11 Am. Jur., Constitutional Law, § 291, p. 1056.

In *Hume v. Rogue River Packing Co.,* supra, an act, which granted to owners of tidelands and to riparian owners above tidewaters on certain rivers, as appurtenant to their lands, the exclusive right to fish for salmon with seines and nets, was held to violate the "equal rights" clause of the state constitution so far as it attempted to grant the exclusive right to fish in navigable waters. The court said that the act was unconstitutional, in that it granted a monopoly in a lawful and uninjurious business, which was formerly enjoyed and possessed by the public as of common right.

So in *State v. Wright,* supra, a case which involved the question of the validity of a license required of

one class of peddlers but not of all, the court held that such requirement infringed the constitutional "equal rights" guaranty, and was therefore invalid.

The Commission contends that there is nothing in the act which grants a monopoly of salmon fishing to gill-netters. On the contrary, it says, the act applies equally to all citizens of the state. Plaintiffs say, however, that the evidence indicates that, if the act is sustained, its effect will be to make profitable gill-net fishing, for all practical purposes, a gill-netters' monopoly. The same argument was made in *Driscoll v. Berg,* supra (137 Or. 499, 293 P. 586, 1 P. 2d 611), and in *Radich v. Frederickson,* 139 Or. 378, 10 P. 2d 352. In the Driscoll case there was evidence tending to show that union fishermen prevented nonunion fishermen from catching fish in certain drifts by laying out nets in such a manner as to intercept any fish that might otherwise have come into the nonunion fishermen's nets. And in the Radich case there was evidence that gill-net fishermen would not permit anyone to use a certain drift who refused to submit to a certain amount of regulation in fishing and to bear a part of the expense of clearing the drift grounds of snags and other obstructions. It was held in those cases that there was no evidence that any party before the court had been concerned with the practices so alleged. In the case at bar, there was testimony by one fisherman that, in his opinion, anyone who sought to fish with gill-nets in the drifts occupied by union fishermen, without complying with their regulations, might find that the latter "can make it rough for him." There was no evidence, however, that any of the fixed-gear fishermen who are parties here had been prevented from gill-net fishing. It is true, as pointed out by the plain-

tiffs, that neither case cited above decided whether or not gill-netters may lawfully appropriate to themselves stretches of the river and exclude others therefrom by force, but that question is not before the court. It should be obvious, in any event, that they may not lawfully do so.

The gill-netters say that none of the cases relied upon by plaintiffs has held that the abolition of one type of fishing gear discriminates between classes of citizens. They say, moreover, that the abolition of one type of fishing gear does not give the users of another type of gear a monopoly of fishing, because, notwithstanding such abolition, all fishermen have the equal right to take fish by the unprohibited means left untouched by the law. They cite in this connection *State v. Blanchard,* supra (96 Or. 79, 189 P. 421), in which the defendant contended that a law banning set-nets in certain waters was discriminatory and hence unconstitutional. The court thought otherwise, and held that the legislature might lawfully prescribe the method by which fish might be taken. See also *State v. Catholic,* 75 Or. 367, 374, 147 P. 372, holding that the state, in exercising a measure of its police power, may protect fish in navigable waters by reasonably regulating the manner of their capture. The court cited, in that connection, *Barbier v. Connolly,* 113 U. S. 27, 32, 28 L. ed. 923, 5 Sup. Ct. 357, to the point that while class legislation discriminating against some and favoring others is prohibited, legislation which, in carrying out a public purpose, is limited in its application, is not unconstitutional if within the sphere of its operation it affects alike all persons similarly situated.

■ It is well settled that discrimination in legislation, as between persons engaged in the same business,

must have a reasonable basis and must not be merely arbitrary. *Harper v. Galloway,* 58 Fla. 255, 51 So. 226, 228. Plaintiffs argue that there is no reasonable basis for the discrimination against fixed-gear fishermen, because, they say, the evidence shows that fixed gear is no more harmful in operation that any other type of gear. It is true that the purpose of all types of fishing gear is to catch fish, and that fish caught in fixed gear are not harmed any more, and are perhaps harmed less, than fish caught with any other gear. There was evidence, however, that fish traps and seines take not only salmon, but also smaller fish which are usually not taken in the gill-netting operation. One witness said that such smaller fish, which are not accepted by the canneries, are "shoveled overboard". There was evidence, also, that the fixed gear is set up in locations which may be described as natural fishways or channels which the fish follow in making their runs, the inference being that, because of a relatively greater concentration of fish in such channels, fixed gear is more efficient than floating gear. These facts tend to show that there is a reasonable basis for discrimination against fixed-gear fishing. The belief that a wider distribution of food fish might be obtained by the prohibiting of angling from boats was held to be entitled to weight in consideration of the constitutionality of an act providing such prohibition. *Thomson v. Dana,* 52 F. 2d 759, 764.

Witnesses spoke of a "gentlemen's agreement" in regard to the use of the gill-net drifts. Such agreement, they said, is recognized by all gill-net fishermen in good repute. Under it, informally organized groups of fishermen clear certain stretches of the river and endeavor to exclude others therefrom, sometimes even

by force. The situation is similar to that which at one time existed upon the public domain, when stockmen grazed their flocks and herds thereon without restriction or regulation. It became necessary eventually for the government to allot specific tracts to individual stockmen, even giving a preference based, among other things, upon prior occupancy. It has been held that a state may adopt legislation giving grazing preference to stockmen based upon prior occupancy of public lands. *Omaechevarria v. Idaho,* 246 U. S. 343, 62 L. ed. 763, 38 Sup. Ct. 323. Cf. *Big Butte Horse & Cattle Ass'n. v. Anderson,* 133 Or. 171, 182, 289 P. 503, 70 A. L. R. 399.

In *Wampler v. Lecompte,* 282 U. S. 172, 174, 75 L. ed. 276, 51 Sup. Ct. 92, it was held that the equality clause of the United States Constitution was not violated by special provisions of a law permitting duck blinds in certain inland waters to be placed closer together than the same law required in general. Referring to such special provisions, the court said: "Why these provisions were inserted in the statute we are not informed, but we may assume, until the contrary is shown, that a state of facts in respect thereto existed which warranted the legislature in so legislating."

In this connection it is to be observed that the burden of proof of arbitrary classification rests upon the party asserting such. *Thomson v. Dana,* supra (52 F. 2d 759, 763). In that case, the court observed that the history of legislation is replete with statutory prohibitions of various fishing devices, which, for the time, the particular state concerned conceived to be peculiarly destructive of fish. It held that the prohibition of angling from boats was not an illegal de-

privation of the property of boat owners, without due process of law, nor a denial of equal protection of the laws. The conservation of food fish for the common good was held to be a paramount consideration, and reasonable regulations to that end did not infringe the equality clause of the federal constitution. The court said that whatever businesses may be built up on a particular method of fishing, such as angling, the operators thereof must have realized that the businesses were transacted at sufferance, and were subject to destruction "whenever the policy of conservation of fish in the stream required."

> " * * * It will perhaps be sufficient to say that the unreasonableness and arbitrariness complained of consist in the prohibiting of the taking of fish from the Pacific Ocean and rivers and harbors adjacent thereto by means of a purse seine, while permitting fish to be taken therefrom with set nets, pound nets, gill nets, and drag seines; * * * It seems too plain to justify lengthy discussion that this contention presents a legislative, not a judicial, question. * * * It is well sustained in the authorities that the legislative determination of such questions is conclusive upon the courts, unless it manifestly appears that the regulations imposed cannot have any relation to the accomplishment of the purpose in view. [Citing cases]" Lubetich v. Pollock, 6 F. 2d 237, 242.

In our opinion, the state, under its police power, in order to prevent the extermination of food fish and bring about their increase, may lawfully prescribe the methods by which they may be taken. *State v. Hume,* supra (52 Or. 1, 6, 95 P. 808). The act under consideration applies equally to all persons; that is to say, all persons are forbidden to use fixed gear in fishing for salmon in the Columbia River. This is a proper

exercise of the police power. *Sherrill v. State*, 84 Ark. 470, 106 S. W. 967, 969; *Smith v. Maryland*, 18 How. (U. S.) 71, 75, 15 L. ed. 269. The fact that such prohibition may prevent the use of property and appliances now owned by the plaintiffs does not affect the constitutionality of the law. They acquired such property with the knowledge that the law-making power might at any time take away the right to use it for fishing purposes. *City of Portland v. Meyer*, 32 Or. 368, 371, 52 P. 21.

It is contended that in sponsoring the initiative act the gill-netters had the ulterior motive of creating a monopoly of fishing in their favor by destroying competition. Reference is made to their argument in the voters' pamphlet which, it is said, "indulged in the greatest exaggerations and misstatements". It is insisted, moreover, that the court may not presume that the people of Oregon gave to the measure the care, consideration and study that the legislature presumably would have given it.

The argument is not new. The late Richard W. Montague took special note of it in a pamphlet published in 1914, entitled "The Oregon System at Work." Under the heading, Protection of Salmon (p. 263), he said:

"In 1908 were submitted the bills for the regulation of the salmon industry, which have served every writer opposed to popular legislation for his dreadful example. The majority which is so roundly denounced by these critics as ignorant and stupid included the writer and most of the thoughtful men of his acquaintance. * * * Here are the facts: Salmon fishing in Oregon is a business of great economic importance. The fishers and canners are divided into two hostile camps, the down-stream gill-netters and seiners, and the up-river wheel

fishers. Between them they were rapidly and surely exterminating the fish, but each mustered force enough in the legislature every session to block any effective regulation of its form of destruction. At length it became evident that something must be done or the industry would go to ruin. In this juncture each camp betook itself to the initiative and presented a bill relegating the other's style of fishing out of existence.''

The author went on to say that the people determined to vote ''No'' on both bills, and did so by a handsome majority, ''and at the ensuing session of the legislature a meek and chastened salmon lobby welcomed a bill conforming to the recommendations of the state conservation commission, which at last afforded a little real protection to a noble fish and a failing industry. I submit that a little more of this kind of ignorance and stupidity earlier applied would have been better than the wisdom of the captains of industry.'' Mr. Montague said further: (p. 265)

''The composite voter whose mind and purpose are portrayed by these votes appears to be one jealous of his own rights and privileges, as most men are; resolute to see his government actually, as well as theoretically, deriving its just powers from the consent of the governed, and to see politics clean and fair; desirous of improvement of his institutions; open to thoughtful advice, and mindful of well reasoned opinion as to the means of betterment, but averse to visionary innovations; * * * nearly abreast of the best thought of the time in matters of social and industrial regulation, but lagging behind, and a bit muddled, in economics; * * * ''

Another writer on the subject, Professor James D. Barnett, published in 1915 a textbook entitled, ''The Operation of the Initiative, Referendum, and Recall

in Oregon''. Dealing with the subject of the means of information available to the voters he calls attention to the fact (p. 93) that the law provides for an official state publication known as ''the voters' pamphlet'', which is sent by the secretary of state to each registered voter not later than 90 days before a general election and not later than 30 days before a special election at which any measures are to be submitted to the voters. Such pamphlet contains the title and text of each measure and may contain an argument by the sponsors of an initiative measure in its favor. Anyone opposing the measure may insert arguments against it. The author thought that the pamphlet was the only means available to the great majority of voters for getting first-hand knowledge of the measure submitted, and he was of the opinion that the extent to which the voters in general make use of it is very uncertain. ''But the pamphlet is used a great deal for reference to supplement other sources of information, and has probably had most of its usefulness in this direction. Moreover, the arguments in the pamphlet are published in condensed form by newspapers, and thus reach many voters.'' Professor Barnett concludes: ''In spite of the difficulties in the situation, the results of the several elections are, in general, competent evidence as to the intelligence of the vote cast.''

There is, of course, no system of legislation, whether representative or direct, that is perfect and free from all objectionable features. See F. V. Holman, Some Instances of Unsatisfactory Results under Initiative Amendments of the Oregon Constitution. See, also, Charles H. Carey, New Responsibilities of Citizenship. ██ It is said that in the construction of statutes

there is no essential difference between those enacted by the initiative and referendum and those enacted in the usual way. 28 Am. Jur., Initiative, Referendum, and Recall, Sec. 43. As to statutes enacted by the legislature, there is a presumption that historical facts in connection with the subject matter, including opposing theories, were known to the legislature at the time of the adoption of the act. 50 Am. Jur., Statutes, Sec. 295; *Jacobson v. Massachusetts,* 197 U. S. 11, 49 L. ed. 643; 25 Sup. Ct. 358, 363.

■ In *Hodges v. Dawdy,* 104 Ark. 583, 149 S. W. 656, it was held that in interpreting a constitutional amendment the court was confined to a construction of the language used, and might not consider the construction put upon it during the campaign for its adoption. Nor could the court, in construing the meaning of the amendment, give any force to the fact that a majority of the voters of the state might be presumed to have accepted the interpretation of the amendment placed upon it by its advocates. In *Stetson v. Seattle,* 74 Wash. 606, 134 P. 494, the court held that it should not presume anything that would negative the natural inferences that might be drawn from the act itself. And in another case, the court went so far as to declare that when a statute had passed the legislature, had been submitted to the people by a referendum petition, and had been approved by them, it was against public policy for the court to declare it invalid on the ground that it did not receive the required publicity before being voted upon. *Allen v. State,* 14 Ariz. 458, 130 P. 1114, 44 L. R. A., N.S., 468. 59 C. J., Statutes, Sec. 303. Questions of policy respecting the economic importance of the salmon industry to the state are to be determined by the legislative authority

—in this case, the people. It is not for the court to undertake to revise their judgment upon such questions. *State ex rel. Campbell v. Case,* supra (182 Wash. 334, 346, 47 P. (2d) 24).

█ On the whole, in view of the jealous regard of the people for the initiative process and of the opportunities which exist for the voters to acquaint themselves with the background and merits of a proposed initiative measure, we are of the opinion that, in the construction of such measures, the courts should indulge the same presumption as to the knowledge of historical facts on the part of the people, as they indulge with reference to acts passed by the legislature.

The next contention is that the act is unconstitutional, as depriving plaintiffs of their property and of their right to earn their livelihood, without due process of law and without compensation. It is pointed out that fishing is not a business inherently dangerous, nor one inherently harmful to the public. It is, however, a business subject to regulation for the public good, including, as has been shown, necessary regulation for the conservation of the fish. As to the reasonableness of the present act, we have discussed this at length. It is once more argued that the evidence showed conclusively that no one type of fishing gear is more harmful than another, and particular reference is made to a pamphlet prepared by Donald R. Johnson, W. M. Chapman and R. W. Schoning, fishery biologists employed by the Commission, entitled, The Effects on Salmon Populations of the Partial Elimination of Fixed Fishing Gear on the Columbia River in 1935. In this pamphlet, the compilers, among other matters, stated:

> "So far as is known, the major effect of each gear on the salmon and steelhead runs is to sub-

tract fish from the populations. Hence the catch statistics appear to be the only criterion for comparing types of gear.

" * * * It appears that the elimination of any one type of gear on the Columbia River has served only to increase the catch by other gears rather than increase the escapement. The trend of total annual production of Chinook salmon in the Columbia River has not changed appreciably in the nineteen years under consideration (1928 through 1946). This is interesting in view of the fact that elimination of fixed gear (fishwheels, traps, seines, and set nets) in 1935, from the Washington side of the river was undertaken presumably to reduce the catch and increase the spawning escapement. The results have not been precisely as planned. While the Washington catch has dropped sharply since 1934, the Oregon catch, despite the slight decline in total production from the river, has actually increased * * *. A probable reason for this is that the Oregon catch has been for many years principally from gill nets and seines, and although the best trap sites were on the Washington side of the river, many of the best gill net drifts and seine grounds were on the Oregon side. In such an intensive fishery as that practiced on the Columbia River, there is presumably competition between the different types of gear. The elimination of traps and seines from the Washington side of the river left more fish for the gill nets and Oregon seines to catch. There were insufficient gill nets in Washington to make up for the loss from traps and seines, but the continuation of the use of all gear on the Oregon side gave rise to an actual increase in Oregon's landings * * *."

In summary, the report states that there is no conclusive evidence that the elimination of fixed gear on the Washington side of the river increased the escapement of salmon and steelhead, or that the use

of any gear is injurious to the run except by subtracting fish therefrom. We note, however, that the increase in the total Oregon landings is attributed to the elimination of fixed gear from the Washington side and the continuation of the use of all gear on the Oregon side.

We have said that the preservation of fish and game is within the proper scope of the police power; that while the legislature is not the final judge of the limitations of that power, and legislative action in that regard must be limited to such as is reasonably necessary for the public benefit, yet it is the legislative function primarily to determine the necessity or expediency of measures adopted; and that, when the courts are called upon to apply the judicial test of reasonableness, they will accord to the legislative authority, whether legislature or people, a large discretion in determining, not only what the public interest requires, but also what measures are necessary for the protection of such interests, the presumption being in favor of the reasonableness and validity of the regulation. See *Union Fishermen's Co. v. Shoemaker,* supra (98 Or. 659, 674, 193 P. 476, 194 P. 854). In our opinion, the evidence does not conclusively show that the act fails to meet the test of reasonableness, and we think that the presumption in favor thereof should prevail.

The Commission has cross-appealed from the decree, assigning as error the court's holding that sections 1 and 3 of the act go beyond the scope of the title of the act, and that section 2 is void so far as it prohibits the taking of salmon trout or steelhead by fixed appliances.

■■ Section 1 makes it unlawful to operate any drag seine in the Columbia River or its tributaries. The lower court held that the title of the act defines its purpose only as prohibiting the taking of salmon by the use of drag seines, whereas section 1 of the act goes beyond the scope of the title in that it makes it unlawful to operate drag seines for any purpose. This, the court considered, violated Art. IV, section 20, of the Constitution of Oregon, which provides that "Every act shall embrace but one subject, and matters properly connected therewith, which subject shall be expressed in the title." The constitutional provision is applicable to initiative acts as well as to those adopted by the legislature. *Turnidge v. Thompson,* 89 Or. 637, 175 P. 281; *Malloy v. Marshall-Wells Hardware Co.,* 90 Or. 303, 173 P. 267, 175 P. 659, 176 P. 589. In this connection this court, in referendum cases, has held that, in considering whether the title of an act is broad enough to express the subject of the act, the court must take into consideration the ballot title furnished by the attorney general. Such ballot title is a part of the title of the act, and defects and omissions in the legislative title may be remedied thereby. *State v. Hawks,* 110 Or. 497, 503, 222 P. 1071; *State v. Putney,* 110 Or. 634, 647, 224 P. 279; *Sprague v. Fisher,* 184 Or. 1, 24, 203 P. 2d 274, reversed on other grounds, 184 Or. 63, 197 P. 2d 662.

The ballot title furnished by the attorney general read as follows:

"PROHIBITING SALMON FISHING IN COLUMBIA RIVER WITH FIXED APPLIANCES—Purpose: Making it unlawful to construct or maintain in waters of Columbia river or tributaries, any pound net, fish trap, fish wheel, scow fish wheel, setnet, weir, drag seine, whip seine, or

other fixed appliance, for catching salmon, salmon trout or steelhead; defining a setnet and seine. Excepting state and national government in catching fish for propagation or scientific purposes, and Indians under federal regulation. Providing penalties for violations, and subjecting all unlawful gear and appliances to condemnation and sale; proceeds and fines arising from violations to be paid to state treasurer for benefit of state fish commission.''

It will be observed that such title includes within the purposes of the act the abolition of drag seines among the other fixed appliances mentioned.

 While the provisions of Art. IV, section 20, of the Constitution are mandatory, nevertheless they are to be liberally construed. *Calder v. Orr,* 105 Or. 223, 230, 209 P. 479. From a reading of the act in its entirety, including the initiative petioners' title and the ballot title, we think it is obvious that its intention was to prohibit the taking of salmon, salmon trout or steelhead by the fixed appliances specifically mentioned in sections 1, 2, and 3. We are required, in the interpretation of a statute, to give it such construction as will, if possible, give effect to the whole of it. Sec. 2-216, O. C. L. A. The various sections should be construed in pari materia. *Wong Sing v. Independence,* 47 Or. 231, 236, 83 P. 387.

"The practical inquiry is usually what a particular provision, clause or word means. To answer it one must proceed as he would with any other composition—construe it with reference to the leading idea or purpose of the whole instrument. A statute is passed as a whole and not in parts or sections and is animated by one general purpose and intent. Consequently each part or section should be construed in connection with every other part or section and so as to produce a harmonious

whole. It is not proper to confine the attention to the one section to be construed.'' Driscoll v. Klamath County, 122 Or. 515, 518, 259 P. 915.

The main idea of the act was the prohibition of the use of fixed gear in fishing for salmon, salmon trout and steelhead. The Commission is given authority by law to classify all fishing appliances. Sec. 83-213, O. C. L. A. The evidence shows that it has classified both drag and whip seines as fixed gear, and section 2 of the act definitely prohibits the taking of salmon, salmon trout or steelhead by any fixed appliance, which would, of course, include drag and whip seines. Moreover, section 83-605, O. C. L. A., as amended by chapter 34, Oregon Laws 1947, specifically classifies drag seines as fixed gear.

Construing sections 1 and 2, separately, with reference to the general purpose of the act and in pari materia with each other and with all the other sections, we are of the opinion that the language of such sections did not go beyond the scope of the title of the act, and therefore that they are not violative of Art. IV, section 20 of the state constitution. *Riggs v. Polk County,* 51 Or. 509, 95 P. 5; *Calder v. Orr,* supra; *Banfield v. Schulderman,* 137 Or. 167, 178, 296 P. 1066, 298 P. 904, 89 A. L. R. 504; *Duncan v. Dryer,* 71 Or. 548, 559, 143 P. 644; *Hunter v. Cunning,* 176 Or. 250, 285, 154 P. 2d 562, 157 P. 2d 510.

Section 2 of the act makes it unlawful to operate any pound net, fish trap, fish wheel, scow fish wheel, setnet or weir, or any fixed appliance for the purpose of catching salmon, salmon trout or steelhead in the Columbia River or its tributaries, or to take any such fish by any such means. The lower court held that this section violated Art. IV, section 20, Constitution,

in that it went beyond the scope of the title of the act, which title declared the purpose of the act as being the prohibition of the taking of salmon only by fixed appliances. We have already held to the contrary in this opinion.

The gill-net fishermen have also cross-appealed from the decree. Their assignments of error and argument in support thereof cover in the main the same ground as that presented by the cross appeal of the Commission, and require no further discussion.

We are of the opinion that the circuit court erred in holding sections 1 and 3 of the act, and section 2 of the act so far as it prohibits the taking of salmon trout or steelhead by fixed appliances, to be violative of the provisions of Art. IV, section 20 of the Constitution of Oregon. Those portions of the decree which so held will be reversed, and the remainder affirmed. The cause will be remanded for further proceedings not inconsistent with this opinion. No party shall recover costs on this appeal.

### ON PETITION FOR REHEARING

*Ryan & Pelay*, of Portland, for the petition.

*George Neuner*, Attorney General of Oregon, and *Cecil Quesseth*, Assistant Attorney General, of Salem, for respondents and cross-appellants, contra.

*Anderson & Franklin*, of Portland, for intervenors-respondents and cross-appellants, contra.

Before LUSK, Chief Justice, and BRAND, BELT,[*] ROSSMAN, HAY, and LATOURETTE, Justices.

DENIED.

---

[*] Died August 6, 1950.

HAY, J.

The plaintiffs, who are appellants and cross respondents, have filed a petition for rehearing in this case based upon the asserted grounds (1) that the court erred in holding that there was evidence that fish traps take not only salmon but smaller fish which are usually not taken in gill-netting operations, and, (2) that we erred in holding that the evidence does not conclusively show that the initiative act fails to meet the test of reasonableness, and that, therefore, the presumption in favor of reasonableness should prevail.

Although no brief accompanied the petition, we have re-examined our opinion in these respects, and are satisfied that the petition is not well-founded. It is therefore denied.

In our opinion in this case we said that the cause would be remanded for further proceedings not inconsistent therewith. Upon further consideration we have concluded, in the state of the record, that a remand for further proceedings would be inappropriate. The cause will therefore be remanded with directions that it be dismissed.