Argued and submitted May 12, reversed and remanded December 29, 2004

# STATE OF OREGON,
## *Appellant,*

*v.*

# CLARK ZANE COUCH,
## *Respondent.*

## MI01-0414; A119570

103 P3d 671

Denise G. Fjordbeck, Assistant Attorney General, argued the cause for appellant. With her on the briefs were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Marc T. Andersen argued the cause for respondent. On the brief was Foster A. Glass.

Before Landau, Presiding Judge, Brewer, Chief Judge, and Armstrong, Judge.

LANDAU, P. J.

**LANDAU, P. J.**

The state charged defendant by information with over four dozen violations of state wildlife laws and regulations arising out of his possession, sale, and hunting of several species of nonindigenous deer on a game farm. Defendant demurred to the information on the ground that the state lacks authority to regulate his possession, sale, or hunting of captive nonindigenous species. The trial court agreed and entered an order dismissing the charges. The state appeals, arguing that the trial court erred in concluding that the state lacks authority to regulate the possession, sale, or hunting of captive nonindigenous species of deer. We reverse and remand.

## I. REGULATORY BACKGROUND

A brief summary of the regulatory context will aid in understanding our disposition of this appeal. ORS 498.002 declares:

> "Wildlife is the property of the state. No person shall angle for, take, hunt, trap or possess, or assist another in angling for, taking, hunting, trapping or possessing any wildlife in violation of the wildlife laws or of any rule promulgated pursuant thereto."

ORS 498.022 similarly provides that, "[e]xcept as the State Fish and Wildlife Commission by rule may provide otherwise, no person shall purchase, sell or exchange, or offer to purchase, sell or exchange any wildlife, or any part thereof." And ORS 496.992(1) declares that it is a Class A misdemeanor to violate any provision of the state wildlife laws. None of those three statutes defines the term "wildlife." ORS 496.004(19), however, provides—albeit somewhat tautologically—that the term "wildlife" means "fish, shellfish, wild birds, amphibians and reptiles, feral swine * * * and other wild mammals."

ORS 497.228(1) provides that "[n]o person shall engage in the business of propagating game birds or game mammals for sale unless a wildlife propagation license is first obtained from the State Department of Fish and Wildlife" (department). The statute further provides that the Oregon

Fish and Wildlife Commission (commission) may refuse to issue such a license "if the commission finds that the conduct of the wildlife propagation business would tend to be harmful to existing wildlife populations." ORS 497.228(2). The term "game mammal" refers to, among other things, "deer." ORS 496.004(9). The wildlife statutes also include ORS 498.052, which provides that "[n]o person shall release within this state any domestically raised wildlife or wildlife brought to this state from any place outside this state unless the person first obtains a permit."

The commission is charged with managing the state's wildlife in the following terms:

"It is the policy of the State of Oregon that wildlife shall be managed to prevent serious depletion of any indigenous species and to provide the optimum recreational and aesthetic benefits for present and future generations of the citizens of this state. In furtherance of this policy the State Fish and Wildlife Commission shall represent the public interest of the State of Oregon and implement the following coequal goals of wildlife management:

"(1) To maintain all species of wildlife at optimum levels.

"(2) To develop and manage the lands and waters of this state in a manner that will enhance the production and public enjoyment of wildlife.

"(3) To permit an orderly and equitable utilization of available wildlife.

"(4) To develop and maintain public access to the lands and waters of the state and the wildlife resources thereon.

"(5) To regulate wildlife populations and the public enjoyment of wildlife in a manner that is compatible with primary uses of the lands and waters of the state.

"(6) To provide optimum recreational benefits.

"(7) To make decisions that affect wildlife resources of the state for the benefit of the wildlife resources and to make decisions that allow for the best social, economic and recreational utilization of wildlife resources by all user groups."

ORS 496.012.

The commission has been authorized to promulgate administrative rules in accordance with the procedural requirements of the Administrative Procedures Act, ORS 183.310 to 183.750, to implement the policies and objectives stated in ORS 496.012. ORS 496.138(2). In addition, ORS 497.308 prohibits any person from removing wildlife from its natural habitat without a permit and authorizes the commission to prescribe the wildlife species for which holding or habitat removal permits are required.

In 1993, the commission adopted rules regulating the private holding or propagation of species of mammals in the family of Cervidae, commonly known as "cervids." The rules provide that, to protect and enhance Oregon's wildlife populations, the commission opposes:

"(1) Any commercial or private use of wildlife that threatens this natural resource. The commission specifically opposes the private ownership and commercial use of all native cervids;

"(2) The commercial use of nonindigenous cervid species if that activity poses a risk to native wildlife or wildlife habitat; and

"(3) The taking of cervid species by hunting while held under a Cervid Propagation License—Type I or a Cervid Propagation License—Type 2."

OAR 635-049-0010.

To implement that general policy, the commission's rules provide that "[i]t is prohibited to possess, purchase, sell, exchange or otherwise hold any cervid or part thereof in the state of Oregon unless specifically excepted" by rule. OAR 635-049-0020. The rules further provide that, subject to several exceptions, "[i]t is *unlawful* to hunt, kill, or attempt to hunt or kill, * * * game mammals * * * held or obtained by private parties." OAR 635-064-0010 (emphasis in original). The term "game mammals" refers to, among other things, "deer." OAR 635-045-0002(33).

## II. FACTUAL BACKGROUND

As we have noted, the state charged defendant by information. Because the issue before us is the legal sufficiency of the information, there are no disputed facts. The charges included 22 counts of unlawful sale of wildlife, in violation of OAR 635-049-0020; 25 counts of aiding and abetting the unlawful hunting of wildlife, in violation of OAR 635-064-0010; and three counts of unlawful possession of wildlife, in violation of OAR 635-049-0020. In each of the foregoing counts, the information alleged that defendant possessed, sold, or hunted fallow deer, Axis deer, or Sika deer.[1] In the 25 counts of aiding and abetting the unlawful hunting of wildlife, the information alleges that each deer is "an exotic mammal held by a private party." The information does not specify how the animals came to be held by the private party, and it does not specify the identity of the private party who holds them.

None of the three species of deer involved in this case is indigenous to Oregon. Fallow deer (*Dama dama*) are a species of deer indigenous to Europe (*Dama dama dama*) and the Middle East (*Dama dama mesopotamica*).[2] Axis deer (*Cervus axix*) are native to India, where they are known as "chital." In the early twentieth century, they were introduced into Texas, where there now are sizeable free-ranging herds. Sika deer (*Cervus nippon*) are native to Japan, although they have been introduced into European forests and parks, into the island of Madagascar, and into the State of Maryland. All three species are considered cervids.

Defendant demurred to the information. He argued that the commission's authority is limited to the regulation of "wildlife." Building on that premise, defendant then asserted that, because the three species of deer that are involved in

[1] One additional count alleged that defendant unlawfully possessed elk, in violation of OAR 635-049-0020. The trial court did not dismiss that count, and the court's decision in that regard has not been assigned as error on appeal.

[2] Fallow deer are perhaps best known from popular seventeenth- and eighteenth-century Robin Hood ballads that celebrated poaching the King's "fat fallow-deer." *See, e.g.,* "Robin Hood and Little John," in *The Ballad Book* 369 (MacEdward Leach ed. 1955).

this case are captive and nonindigenous, they are not "wildlife" within the meaning of the statutes that define the commission's authority. Accordingly, defendant concluded, the rules prohibiting the possession, sale, or hunting of the species of deer involved in this case are *ultra vires*. The state responded that the legislature intended the term "wildlife" to be broad enough to include both indigenous and nonindigenous species, whether captive or free roaming.

The trial court sustained the demurrer and dismissed the charges. The court reasoned that, because the species of deer involved are nonindigenous captives, they are not "wildlife" within the meaning of the statutes that the commission administers. The court explained that, from its perspective, "wildlife is indigenous species that are running free or swimming free on the lands or the waters of this state." In this case, the court noted, the game are "being raised on a game farm within a confined setting and under the ownership of a property landowner." Those animals, the court concluded, "are not wildlife *per se*." As a result, the court concluded that the regulations that form the basis for each of the 50 charges against defendant are "*ultra vires* acts that go beyond the delegation set forward by the Oregon State Legislature. These animals are not wildlife, but privately owned, exotic species of cervids."

### III. DISPOSITION OF THE MERITS

On appeal, the state argues that the trial court erred in concluding that, because the deer involved in this case are not "wildlife" within the meaning of the commission's authorizing statutes, the rules that prohibit the possession, sale, or hunting of those deer are invalid. According to the state, the statutory term "wildlife" as it is used in the relevant statutes, is not limited to indigenous, noncaptive animals. In the alternative, the state argues that, even if the term "wildlife" is as limited as the trial court suggested, the commission's authority is not limited to the regulation of wildlife. The state argues that, if it is necessary to protect wildlife, the authority of the commission extends to the regulation of species that may not themselves be wildlife. In this case, the state argues, the commission has promulgated regulations prohibiting the possession, sale, or hunting of nonindigenous deer precisely

because of the potential danger that those species pose to indigenous species. Defendant replies that, to the extent that the state is asserting authority to regulate species that are not "wildlife," it has exceeded the limitations on its authority imposed by the Commerce Clause of the United States Constitution.

 We review the trial court's ruling on a demurrer to a charging instrument for errors of law. *State ex rel Juv. Dept. v. Aragorn*, 189 Or App 65, 72, 73 P3d 939, *rev den*, 336 Or 192 (2003). In this case, the court's ruling rested on its construction of the relevant statutes defining the scope of the commission's authority to regulate captive nonindigenous deer. That is a question of statutory construction, which we answer by reference to the interpretive method set out in *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993). We begin with the text in context and, if necessary, consult legislative history and other aids to construction, always with the goal of ascertaining the meaning most likely intended by the legislature that enacted the statute. *Id.*

 When, as in this case, our review involves an administrative agency's construction of a statute, there also is the potential for some measure of deference to the agency's construction, depending on the nature of the statutory terms at issue. As the Supreme Court explained in *Coast Security Mortgage Corp. v. Real Estate Agency*, 331 Or 348, 353-54, 15 P3d 29 (2000):

> "When an agency's interpretation or application of a provision of law is at issue, the reviewing court's standard of review depends upon whether the phrase at issue is an exact term, an inexact term, or a delegative term. 'Exact terms' impart relatively precise meanings, and their applicability in a particular case involves only agency factfinding. This court reviews agency application of 'exact terms' for substantial evidence. 'Inexact terms' are less precise. Although they embody a complete expression of legislative meaning, that meaning always may not be obvious. As to 'inexact terms,' the task of the agency, and ultimately of the court, is to determine what the legislature intended by using those words. 'Delegative terms' express incomplete

legislative meaning that the agency is authorized to complete. As to 'delegative terms,' the agency's task is to complete the general legislative policy decision. This court reviews the agency decision concerning a 'delegative term' to determine whether it is within the range of discretion allowed by the more general policy of the statute."

(Citations omitted.) In this case, the disputed term "wildlife" is inexact in nature. Accordingly, we review the commission's construction of it as a matter of law, in accordance with the interpretive principles described in *PGE*. *Coast Security Mortgage Corp.*, 331 Or at 354.

As we have noted, the relevant statutes declare that "wildlife" is the property of the state, ORS 498.002, that no person may purchase, sell, or exchange "wildlife" except as provided by commission rule, ORS 498.022, and that it is a Class A misdemeanor to violate those laws, ORS 496.992(1). None of those statutes defines the term "wildlife." The term is defined elsewhere, however, to refer, as pertinent to this case, to "wild mammals." ORS 496.004(19).

It is tempting to resort to dictionaries to seek out the "ordinary meaning" of the terms "wild" and "wildlife." As defined in *Webster's Third New Int'l Dictionary* 2616 (unabridged ed 2002), the term "wildlife" refers broadly to "living things that are neither human nor domesticated; *esp* : the mammals, birds, and fishes that are hunted by man for sport or food." As such, the term easily could be taken to apply to the species of deer involved in this case, which—at least on the basis of the allegations of the information—are mammals that are hunted for sport or food.

The term "wildlife" as it is used in regulatory legislation, however, comes to us with a history that is rich, extensive, and not quite as simple as the dictionary might otherwise suggest. As the context of an enactment always includes the preexisting common law and the statutory framework within which the law was enacted, *State v. Dahl*, 336 Or 481, 487, 87 P3d 650 (2004), we devote some attention to common-law conceptions of "wildlife" and the state's authority to regulate it.

According to tradition (and necessity, if one is to understand all the Latin terminology that crops up in the

cases), the starting point for understanding the common-law principles that pertain to the regulation of wildlife is ancient Rome.[3] The Romans classified animals as either *ferae naturae* (of a wild nature) or *domitae naturae* (literally, "accustomed to the house," *i.e.*, domesticated). Animals *ferae naturae* were regarded, like the air and the seas, as *nullius bonis*, that is, the property of no one in particular. Being the property of no one, animals *ferae naturae* became the property of the "first taker." The property right was provisional, however. If the animal escaped from possession, it returned to its natural state and became once again *ferae naturae. See generally The Digest of Justinian* 41.1.3 (Alan Watson ed. 1998) ("What presently belongs to no one becomes by natural reason the property of the first taker. * * * But when they escape from our custody and return to their natural state of freedom, they cease to be ours and are again open to the first taker."); *Justinian's Institutes*, 2.1.12-13, 55 (Peter Birks & Grant McLeod eds. 1987) ("Wild animals, birds and fish, the creatures of land, sea and sky, become the property of the taker as soon as they are caught. Where something has no owner, it is reasonable that the person who takes it should have it.").[4]

That basic taxonomy formed the framework for English common-law game laws. The seminal judicial opinion on the point is *The Case of Swans*, 77 Eng Rep 435 (1592), in which Lord Coke wrote the following summary, replete with references to the Roman system of classification:

"A man hath not absolute property in anything which is *ferae naturae*, but in those which are *domitae naturae*. Property qualified and possessory a man may have in those

---

[3] The roots of traditional wildlife law run deeper even than that. Animal rights scholars, for example, point out that the Roman conception of property rights in nonhuman animals has its genesis in ancient Hebrew and Greek anthropocentric world views. Steven Wise, *How Nonhuman Animals Were Trapped in a Nonexistent Universe*, 1 Animal L 15, 18-33 (1995).

[4] Justinian's *Digest* consists of excerpts from existing legal literature collected by a commission of scholars and practitioners into 50 books, themselves divided into titles according to subject. Justinian's *Institutes* was an elementary text book of Roman law prepared by three scholars. Although posterity credits him with both works, the Roman Emperor Justinian actually wrote neither of them. A Roman jurist, Tribonian, did most of the work. *See generally* Barry Nicholas, *An Introduction to Roman Law* 38-48 (1962).

which are *ferae naturae*; * * * but in those which are *ferae naturae*, and by industry are made tame, a man hath but a qualified property in them, *scil.*, so long as they remain tame, for if they do attain to their natural liberty, * * * the property is lost[.]"

*Id.* at 438. A century and a half later, Blackstone summarized the law in similar terms:

"A qualified property may subsist in animals *ferae naturae, per industriam hominis*: by a man's *reclaiming* and making them tame by art, industry, and education; or by so confining them within his own immediate power, that they cannot escape and use their natural liberty. * * * Such as are deer in a park, hares or rabbits in an enclosed warren, doves in a dove-house, pheasants or partridges in a mew, hawks that are fed and commanded by their owners, and fish in a private pond or in trunks. These are no longer the property of man, than while they continue in his keeping or actual possession: but if at any time they regain their natural liberty, his property instantly ceases[.]"

William Blackstone, 2 *Commentaries on The Laws of England* 391-92 (9th ed 1783) (photo reprint 1978).

One Roman idea—that animals *ferae naturae* were held in common by the people—did not survive; or, at least, it became transformed. As Blackstone described it, animals *ferae naturae* belonged not to the people in common but to the King. Blackstone's view of the law did not go unchallenged, however. Indeed, one of his editors, Professor Edward Christian, led a spirited debate in which he contended that Blackstone's views were "perfectly erroneous." *See generally* Edward Christian, *A Treatise on the Game Laws* 58 (1817). Christian took the position that animals *ferae naturae* belonged not to the King but to the owner of the land on which the animals were found. *See generally* Thomas A. Lund, *Early American Wildlife Law*, 51 NYU L Rev 703, 706-09 (1976).

Whether Blackstone's characterization of English common law was accurate is debatable. *See, e.g.*, James A. Tober, *Who Owns the Wildlife? The Political Economy of Conservation in Nineteenth-Century America* 147 (1981) ("much evidence questions [Blackstone's] interpretation").

But the fact remains that, debatable or not, Americans sided with Blackstone's view. For the better part of two centuries, American courts routinely have cited Blackstone for the proposition that all property rights in animals *ferae naturae* lie in the sovereign, which rights were assumed by the colonies and, later, the states. *See, e.g., Cook v. State*, 192 Wash 602, 607, 74 P2d 199, 201-02 (1937) ("[T]he laws of practically all of our states are founded upon the common law of England by virtue of which all property rights in *ferae naturae* were in the sovereign.").[5]

The Supreme Court of Oregon has adopted the same view. In *State v. Hume*, 52 Or 1, 5-6, 95 P 808 (1908), for example, the court explained that

"[i]t is a generally recognized principle that migratory fish in the navigable waters of a state, like game within its borders, are classed as animals *ferae naturae*, the title to which, so far as that claim is capable of being asserted before possession is obtained, is held by the state, in its sovereign capacity in trust for all its citizens."

Similarly, in *Anthony et al. v. Veatch et al.*, 189 Or 462, 487, 220 P2d 493 (1950), the court quoted from a Washington Supreme Court decision the proposition that " '[t]he fish in the waters of the state, and the game in its forests, belong to the people of the state, in their sovereign capacity.' " (Quoting *State v. Tice*, 69 Wash 403, 125 P 168, 169 (1912).)

The states likewise adopted the traditional Roman taxonomy by way of Blackstone, including the notion that the sovereign control that the state may exercise over animals *ferae naturae* is subject to the qualification that it applies only while the animals are free roaming and not lawfully captured. In *State v. Pulos*, 64 Or 92, 95, 129 P 128 (1913), for example, the Oregon Supreme Court explained that "title to wild game is in the State, and that no person has an absolute property right in game or fish *while in a state of nature and at large*." (Emphasis added.)

---

[5] To be sure, the idea that the state "owns" wild game is a legal fiction. *See generally Hughes v. Oklahoma*, 441 US 322, 331-35, 99 S Ct 1727, 60 L Ed 2d 250 (1979). Nevertheless, states—including Oregon—continue to employ such property terminology. *See, e.g.*, ORS 498.002 ("Wildlife is the property of the state.").

Even more to the point for our purposes is the court's decision in *Belanger v. Howard*, 166 Or 408, 112 P2d 1022 (1941). At issue in that case was whether an Oregon breeder of nonindigenous Yukon mink had violated a 1935 statute that prohibited any person from acquiring any property in "fur-bearing" or "wild game" animals. Oregon Code 1935 § 39-201. The court concluded that there had been no violation because the nonindigenous species had been subject to private capture from the moment that they entered the state:

"Section 39-201, we are satisfied, has no application to the minks with which we are concerned. That enactment is concerned with fur-bearing animals, etc., which constitute a part of the wild life or common property of the state. * * * *There is nothing in the record which indicates that these animals were ever a part of the wild life of this state. So far as we know, they had always been in private ownership and were in captivity upon entering the state.* Before § 39-201 could have any application to them the proof should show that these animals had constituted a part of the wild life of the state. No such proof was submitted."

*Belanger*, 166 Or at 420 (emphasis added).

■ It is in this context that we must view the enactment of the statutes at issue in the case before us. As the Supreme Court recently explained in *Weber and Weber*, 337 Or 55, 67-68, 91 P3d 706 (2004), "[a]s part of this court's well-established statutory construction methodology, this court presumes that the legislature enacts statutes in light of existing judicial decisions that have a direct bearing upon those statutes." Certainly, in this case, the court's pronouncements on the scope of the state's authority to regulate "wildlife" are pertinent. Indeed, in *Belanger*, the court spoke to the issue as a matter of construing a predecessor statute involving similar phrasing. *See Krieger v. Just*, 319 Or 328, 336, 876 P2d 754 (1994) (context of a statute includes prior versions).

Thus, when ORS 498.002 declares that "[w]ildlife is the property of the state," we may understand that the reference to "wildlife" fairly clearly is to animals *ferae naturae* over which the state has sovereignty, subject to the traditional qualification that the wildlife be "in a state of nature and at large," *Pulos*, 64 Or at 95, and not previously subject to

lawful capture. That always has been the extent of the state's authority to regulate "wildlife," and nothing in the text or context of the statute suggests that the legislature intended to depart from that longstanding tradition.

Similarly, when ORS 498.022 prohibits the purchase, sale, or exchange of "wildlife," we now may understand that it refers to animals *ferae naturae* that have not previously been subject to lawful capture. When ORS 496.992 prohibits the violation of state "wildlife" laws, it is apparent that the term is used in the same fashion.

 In this case, defendant has been charged with multiple counts of violating rules that prohibit the possession, sale, or hunting of fallow, Axis, or Sika deer. According to defendant, those rules are beyond the authority of the state to regulate "wildlife" because his deer are nonindigenous to Oregon and, more importantly, always have been subject to lawful captivity. In other words, although he did not cite the case (neither party did, actually), defendant argues that his deer in this case are precisely like the mink at issue in *Belanger*, which the Supreme Court held were beyond the regulatory authority of the state because they "had always been in private ownership and were in captivity upon entering the state." 166 Or at 420.

 Defendant may be correct about that. The problem is that, at this juncture, we are reviewing the legal sufficiency of the information by which he has been charged. The information nowhere mentions anything about whether the deer ever have been in captivity, lawful or otherwise. With respect to 25 counts of unlawful hunting, the information states only that the animals involved were "exotic mammal[s] held by a private party." It does not, as we earlier have noted, say how the animals came to be held by a private party or who that private party is. With respect to the balance of the charges, the information says nothing at all about whether the wildlife is, or ever has been, captive. From the briefing of the parties, it appears that the deer were acquired and held by defendant. We do not know that from the allegations in the information, however. And in our evaluation of the legal sufficiency of the information, we are limited to the information that it contains.

Our decision in *State v. Weber*, 172 Or App 704, 19 P3d 378 (2001), makes that very point. In that case, the defendant was charged with violating the basic speed rule. She demurred, arguing that the charge was based on the use of photo radar evidence that her vehicle was observed speeding, without any evidence that she was in the vehicle at the time. The state relied on a statutory presumption that the registered owner of the vehicle was the driver when the citation was issued. Defendant challenged the constitutionality of the statute. On appeal, she assigned error to the overruling of the demurrer. We concluded that we could not address the issue:

> "Here, the accusatory instrument, the traffic citation, simply alleged that defendant violated * * * the basic speed rule. The citation does not even refer to the photo radar statutes. Nowhere on the face of the citation is there any indication that the citation was based on evidence obtained by means of photo radar, and it would have been error for the court to consider that fact in ruling on the demurrer. Thus, defendant's challenge is not, and cannot be, to the facial sufficiency of the charging instrument.

> "* * * Defendant's demurrer sought, improperly to challenge the sufficiency of the state's anticipated proof—including the constitutionality of reference to, and reliance on, the rebuttable statutory presumption. That issue was not properly raised by demurrer and, thus, is not properly before us on review of the denial of the demurrer."

*Id.* at 713-14 (footnote and citations omitted).

In this case, too, defendant's argument focuses not on the facial sufficiency of the information—which contains no information about the manner in which the deer were brought into this state and whether they have been held by defendant in lawful, private captivity. It is instead based on what defendant anticipates will be the proof at trial. Defendant notes that the trial court based its decision on precisely such facts. That is true. It also was error. *Id.* at 714; *see also State v. Reed*, 116 Or App 58, 59, 840 P2d 723 (1992) (error for court to sustain defendant's demurrer on the basis of facts not alleged in the complaint).

Because of our disposition of the parties' principal arguments, we need address neither the state's alternate argument that it has authority to regulate species other than wildlife in order to protect wildlife nor defendant's response that any such regulation violates the federal Commerce Clause.

Reversed and remanded.