Argued and submitted August 25, 2010, declaratory ruling modified to declare that petitioners' animals are the "property of the state" for purposes of ORS 498.002(1); otherwise affirmed April 20, 2011

Steve SIMPSON,
Kathy Simpson,
Sheldon Kirk, Carol Kirk,
Mike Kilpatrick, Cindy Kilpatrick,
William McCamman, Mary McCamman,
Alan Ross, Brenda Ross,
Lonnie Woosley, Louise Woosley,
Steve Pederson,
Clay Woodward, Kim Woodward,
and Clark Couch,
*Petitioners,*

*and*

Donald KELLY
and Marina Kelly,
*Petitioners below,*

*v.*

DEPARTMENT OF FISH AND WILDLIFE,
*Respondent.*

Department of Fish and Wildlife
A141561

255 P3d 565

Geordie Duckler argued the cause and filed the briefs for petitioners.

Stephanie Striffler argued the cause for respondent. On the brief were John R. Kroger, Attorney General, Jerome Lidz, Solicitor General, and Denise G. Fjordbeck, Attorney-in-Charge, Civil/Administrative Appeals.

Sarah Uhlemann filed the brief *amicus curiae* for The Humane Society of the United States.

Before Schuman, Presiding Judge, and Wollheim, Judge, and Rosenblum, Judge.

ROSENBLUM, J.

**ROSENBLUM, J.**

ORS 498.002(1) provides, in part, that "[w]ildlife is the property of the state." Petitioners own game ranches in Oregon. Most of their animals are defined by administrative rule as "wildlife."[1] Petitioners sought a declaratory ruling from the Department of Fish and Wildlife (ODFW) as to whether their animals are the "property of the state" under ORS 498.002(1). ODFW ruled that the state does not own or have any proprietary or possessory interest in petitioners' animals. Petitioners seek judicial review, arguing that ODFW erred in failing to declare that their animals are the property of the state and that the agency's ruling as to the state's interest in their animals is not supported by ORS 498.002(1). On review for errors of law, ORS 183.480, ORS 183.482, we modify the ruling to declare expressly that petitioners' animals are the "property of the state," as that phrase is used in ORS 498.002(1), and otherwise affirm.

This case arose out of actions bearing on the meaning of "wildlife" by all three branches of the state government. In 2006, in *State v. Couch*, 341 Or 610, 147 P3d 322 (2006), the Supreme Court construed that term as it was then defined in ORS 496.004(19) (2005): " 'Wildlife' means fish, shellfish, wild birds, amphibians and reptiles, feral swine as defined by State Department of Agriculture rule and other wild mammals." The question before the court was whether nonindigenous species of deer owned and held in captivity constituted "wildlife." The court concluded that mammals constitute wildlife only if they are "wild"—that is, if they "exist untamed and undomesticated in a state of nature * * *." *Couch*, 341 Or at 620.

In 2007, the Legislative Assembly, in response to *Couch*, amended ORS 496.004(19), granting the State Fish and Wildlife Commission authority to define "wild birds" and "wild mammals": " 'Wildlife' means fish, shellfish, amphibians and reptiles, feral swine as defined by State Department of Agriculture rule, wild birds as defined by commission rule and other wild mammals as defined by commission rule."

---

[1] Among other species, petitioners own bison, which are not defined as "wildlife" by administrative rule. When we refer to "petitioners' animals" in this opinion, we refer to their animals other than bison.

Or Laws 2007, ch 523, § 1; *see also* Staff Measure Summary, House Committee on Agriculture and Natural Resources, SB 804, May 15, 2007 (noting that *Couch* had "narrowed the Commission's authority to regulate wildlife" and that the amendment was intended to "reinstat[e] its ability to regulate wildlife as it had done historically prior to the Supreme Court decision").

After the amendment to ORS 496.004(19) became effective, the commission promulgated OAR 635-057-0000, defining "wild mammals" and "wild birds." The rule expressly states that its purpose is to "clarify the scope of the term 'wildlife'" and that its intent is to "include as 'wild mammals' and 'wild birds' all species which, if viewed globally, typically exist in a wild state." Thus, rather than identifying particular species that constitute wild mammals or wild birds, the rule provides that those terms means *all* mammals and birds, respectively, *except* those species specifically identified in the rule. The species that are excepted from the definitions are those that one might expect to be kept as farm animals or pets, such as cattle, sheep, dogs, cats, chickens, and parakeets.[2]

After the commission promulgated OAR 635-057-0000, petitioners filed a petition seeking a declaratory ruling from ODFW, which administers the commission's rules, regarding the application of ORS 496.004(19), OAR 635-057-0000, and ORS 498.002(1), which provides, in part, "Wildlife is the property of the state."[3] For purposes of obtaining the

---

[2] Specifically, OAR 635-057-0000(1) provides that "wild mammals" means all mammals except alpacas, donkeys, bison, camels, cats (all domestic breeds), cattle and yaks, chinchillas, dogs (all domestic breeds), European rabbits, ferrets, gerbils, goats, gaunacos, guinea pigs, hamsters, horses, house mice, mules and hinnies, llamas, rats, sheep (*ovis aries* and certain hybrids thereof), domestic swine, and vicuñas. OAR 635-057-0000(2) provides that "wild birds" means all birds except cassowaries, chickens, ducks and geese (morphologically distinct from wild waterfowl; except Egyptian geese and Mute swans), emus, guinea fowl, ostriches, parrots, parakeets, lories, cockatoos, peafowl, pigeons, rock doves, rheas, and turkeys (morphologically distinct from wild turkeys).

[3] Petitioners sought the declaratory ruling under ORS 183.410, which provides, in part:

"On petition of any interested person, any agency may in its discretion issue a declaratory ruling with respect to the applicability to any person, property, or state of facts of any rule or statute enforceable by it. A declaratory ruling is binding between the agency and the petitioner on the state of facts alleged, unless it is altered or set aside by a court."

declaration, petitioners stipulated that they hold in captivity in Oregon and have a property interest in elk, fallow deer, ibex, bison, water buffalo, Barbary sheep, and Russian boars. They also stipulated that all of the animals were purchased from licensed holders in Oregon, legally imported from out of state, or born in captivity in petitioners' facilities in Oregon. Petitioners asked ODFW to answer seven questions, two of which are at issue on judicial review: "Are [petitioners'] animals 'wildlife' under ORS 496.004(19)?" and "Are [petitioners'] animals the property of the state under ORS 498.002(1)?" The remaining five questions related to the consequences of their animals being recategorized as "wildlife" on petitioners' rights with respect to their animals.[4]

ODFW appointed a presiding officer to conduct a hearing and propose a declaratory ruling. In their brief, filed before the hearing, petitioners elaborated on the questions they sought to have answered. With respect to the first question, petitioners asserted that, under the new administrative rule, all of their animals except bison had become, by definition, wildlife. With respect to the second question, whether their animals are the property of the state under ORS 498.002(1), they stated,

"Petitioners reasonably believe by extension from the first question that, once their animals are defined as 'wildlife,'

---

[4] The remaining five questions were as follows:

"3. May [petitioners] be prohibited, as a violation of the wildlife laws or of any rule promulgated pursuant thereto, from angling for, taking, hunting, trapping or possessing, or assisting another in angling for, taking, hunting, trapping or possessing, their animals under ORS 498.002(1)?

"4. May [petitioners] be prohibited, as a violation of the wildlife laws or of any rule promulgated pursuant thereto, from purchasing, selling, exchanging, or offering to purchase, sell, or exchange their animals under ORS 498.022?

"5. May [petitioners] be prohibited, as a violation of the wildlife laws or of any rule promulgated pursuant thereto, from removing from its natural habitat or acquiring and holding in captivity their animals under ORS 497.308(1)?

"6. Are [petitioners] required to obtain a wildlife propagation license in order to engage in the business of propagating game mammals for sale under ORS 497.228?

"7. Are [petitioners] subject to any requirements prescribed by the Commission for the care, inspection, transportation, sale, taking, or other disposition, or regarding record keeping or other reporting procedures as to game mammals under ORS 497.228?"

then those animals automatically must become 'the property of the state' by virtue of ORS 498.002(1). It is their express concern, yet also their reasonable belief, that the State for that reason now owns petitioners' animals (again apart from the bison) as its property."

Petitioners went on to acknowledge that

"all of our states appear to be in common agreement that a phrase such as 'wildlife is the property of the state' refers to the concept that wild animals are owned by the state in its sovereign, as distinguished from its proprietary, capacity and it owns them solely as trustee for the use and common benefit of the people in the state.

"* * * * *

"[What petitioners seek from the presiding officer] is an explanation as to how, when read in consistency with all of the state statutes recited above * * *, [OAR 635-057-0000] actually operates at a practical level given the way that it is worded, both in its legal effect on petitioners and on who has rights in their currently held animals."

At the hearing, the arguments of petitioners' counsel followed the theme that the state now owns petitioners' animals:

"I think that phrase 'property of the state' means the state has the ownership interest now, that interest has transferred. My clients, I think, are prohibited from possessing, they are prohibited from buying or selling or holding or acquiring or transferring. * * * To the extent that I don't think either brief went into any detail about ownership law in Oregon, there certainly is case law in Oregon that says whether it's an animal or car or any sort of object. But if it's personal property, ownership carries in tandem with it certain attributes and one attribute of ownership is right to exclusive possession. Another attribute is the right to convey or exchange or transfer or the right to exclude others from being able to do something with that object. If you don't have that bundle of rights, the ability to transfer, the ability to say it's mine and it's not yours, to keep others away from it, or to do things with it that you want in terms of what the market allows you to do, then you don't really have ownership."

ODFW took the position that petitioners' animals are not the "property" of the state in the ownership sense. It contended that, so long as the animals were acquired from licensed holders in Oregon, legally imported from out of state, or born in captivity in petitioners' facilities, the state does not own them.

After the hearing, the presiding officer issued a proposed ruling stating, in response to petitioners' first question, that petitioners' bison are not wildlife but that their "other animals are wild mammals under the rule, and wildlife under the statute." The presiding officer gave a fairly extensive answer to petitioners' second question, as to whether their animals are the property of the state under ORS 498.002(1). His answer is the object of petitioners' arguments before us, so we quote it at length:

"ORS 498.002(1) provides:

" 'Wildlife is the property of the state. No person shall angle for, take, hunt, trap or possess, or assist another in angling for, taking, hunting, trapping or possessing any wildlife in violation of the wildlife laws or of any rule promulgated pursuant thereto.'

"The statute, on its face, would appear to answer petitioners' question in the affirmative, except with regard to bison, which are not wildlife. A closer reading, however, coupled with a review of relevant case law, indicates that the state's property interest in wildlife under ORS 498.002(1) is not a proprietary or possessory interest that amounts to ownership, as ownership is commonly understood.

"It is well regarded that 'the idea that the state "owns" wild game is a legal fiction.' *State v. Couch*, 196 Or App 665, 676 (fn 5)[, 103 P3d 671] (2004), *aff'd on other grounds*, 341 Or 610[, 147 P3d 322] (2006), *citing Hughes v. Oklahoma*, 441 US 322, 331-35[, 99 S Ct 1727, 60 L Ed 2d 250] (1979). *Hughes*, in turn, quoted *Toomer v. Witsell*, 334 US 385[, 68 S Ct 1156, 92 L Ed 1460] (1948), for the proposition that '[t]he whole ownership theory, in fact, is now generally regarded as but a fiction expressive in legal shorthand of the importance to its people that a State have power to preserve and regulate the exploitation of an important resource.' *See Hughes v. Oklahoma*, 441 US at 334. *See also*

*Fields v. Wilson*, 186 Or 491, 498-99[, 207 P2d 153] (1949); and *Monroe v. Withycombe*, 84 Or 328, 334-35[, 165 P 227] (1917).

"* * * * *

"[ODFW], in its brief, acknowledges that the state does not own petitioners' animals in any way other than the 'legal fiction' described in the Court of Appeals' decision in *Couch, supra*: 'So long as petitioners purchased them from licensed holders in Oregon, or legally imported them from out of state, or the animals were born in captivity on petitioners' facilities in Oregon, the State of Oregon does not own them.'

"Petitioners, in their brief, likewise acknowledge that if, within the rubric of wildlife as 'property of the state,' the 'State chooses to allow private ownership by statutory regulation, it may certainly do so * * * and it may employ the general police power to impose a host of conditions and restrictions on that ownership.'

"These two statements from the parties' briefs describe precisely the nature of ownership and regulation of wildlife in Oregon, and petitioners' animals in particular (except for petitioners' bison, which are not wildlife). The State's interest in them is limited to the authority to preserve and regulate; it is not proprietary or possessory. The State's interest does not preclude the right of petitioners to own and possess their animals, subject to applicable laws and regulations adopted in accordance with the State's authority."

(Footnote and some citations omitted; second ellipsis in proposed ruling.) The presiding officer answered each of the remaining five questions, which are not at issue here, in a manner consistent with the view that petitioners retain their proprietary interest in the animals while the state retains authority to regulate their possession and disposition.

ODFW adopted that proposed ruling in whole. In the final declaratory ruling, ODFW stated,

"By law, [the presiding officer's] answers legally bind [ODFW]. Beyond the answers to those seven legal questions, two statements bear repeating:

"• At no time has [ODFW], or the Fish and Wildlife Commission, purported to own petitioners' animals;

"• Rather, as authorized by Oregon law, [ODFW] and the Commission have merely *regulated* petitioners' animals, for the purpose of protecting Oregon's native wildlife for all Oregonians."

(Emphasis in original.)

On judicial review, petitioners argue that ODFW erred in failing to determine that their animals are the property of the state. They make two general arguments in support of their position. First, they contend that the presiding officer failed to answer their second question at all, arguing that their question concerned whether their animals are the "property" of the state, not whether the state "owns" them. Second, they contend that the answer that the presiding officer did give is "fundamentally unsupportable by the specific words of an existing state statute"—namely, ORS 498.002(1). Petitioners reason that their first two questions

"had been phrased to comprise a logical syllogism: If all A are B, and if all B are C, then all A must be C. Under that analysis, it was assumed that if:

"1) *All elk are wildlife*

"and if,

"2) *All wildlife is the property of the state*

"then it must by necessity follow that,

"3) *All elk are therefore the property of the state.*

"[ODFW], accepting as true premises 1) and 2), impermissibly evaded the logical conclusion that 3) then required."

(Italics in original.) In petitioners' view, the meaning of the statute is plain and the state, by operation of ORS 498.002(1), has taken possession of and control over their animals.

In response, ODFW maintains that it has regulatory jurisdiction over, but no proprietary interest in, petitioners' animals. It contends that the presiding officer's answer to petitioners' second question was appropriate because a simple "yes" or "no" answer would not have explained the nature of the state's property interest.

■ We agree with ODFW. Although petitioners' syllogism is logically unassailable, their position that the presiding officer erred is premised on a misunderstanding of the meaning of the term "property" in ORS 498.002(1). Petitioners argue that ODFW cannot claim that the state does not "have a 'proprietary interest' in wildlife since courts give that phrase its common, ordinary meaning such as 'one who has an interest in, control of, or present use of certain property.' " (Quoting *Evans v. U.S.*, 349 F2d 653, 658 (5th Cir 1965).) They also argue that ODFW cannot claim that the state does not " 'possess or have control over' wildlife since ORS 498.002(1) is construed to prevent everyone other than the State from doing just that." Petitioners also contend that, although Oregon courts once recognized that governments "could own property either in public, 'governmental,' capacities, or in private, 'proprietary,' capacities," the "governmental/ proprietary" distinction has since been rejected as " 'unworkable, untenable and unhelpful.' " (Quoting *Northwest Natural Gas Co. v. City of Portland*, 300 Or 291, 302, 711 P2d 119 (1985).)

Regardless of whether courts have given the terms "property" and "proprietary interest" their "common, ordinary" meanings in other contexts or whether courts have found the distinction between "governmental" and "proprietary" ownership unworkable in other contexts, the task presented by this case is to determine what "property" means as used in ORS 498.002(1). Although petitioners' question as to whether their animals are the property of the state under ORS 498.002(1) could be answered "yes" or "no"—and the obvious answer is "yes"—without an explanation of what "property," as used in that statute, means, the simple answer would be devoid of useful substance. Before the presiding officer and in this court, petitioners have made clear that they seek to understand how the governing laws "actually operate[ ] at a practical level" and what their rights are with respect to their animals.[5] Determining what petitioners'

---

[5] In their opening brief in this court, petitioners assert that,

"concerned that a 'takings' had now occurred as a result of the enactment [of OAR 635-057-0000], [they] asked the state wildlife agency which has enacted the regulation to apply the new regulation's effect to their animals and to answer the specific question of whether the state thereby now owned their animals."

rights are, and what the state's interest in the animals is, requires analysis of the term "property," as it is used in ORS 498.002(1). We turn to that task.

 To determine the meaning of a statutory term, we look to the words of the statute in context and, if necessary, to the legislative history and other interpretive aids. *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009). When particular terms are not statutorily defined, we give them their plain, natural, and ordinary meaning unless the context indicates that the legislature intended some other meaning. *State v. Cunningham*, 161 Or App 345, 351-52, 985 P2d 827 (1999). Context includes related statutes and prior versions of the statute, *Jones v. General Motors Corp.*, 325 Or 404, 411, 939 P2d 608 (1997), as well as the pre-existing common law and statutory framework within which the law was enacted, *City of Salem v. Salisbury*, 168 Or App 14, 25, 5 P3d 1131 (2000), *rev den*, 331 Or 633 (2001).

In this case, other statutes within the wildlife laws indicate that "property," as used in ORS 498.002(1), is not intended to have the ordinary meaning given that word. ORS 496.705(1) provides that the commission may institute an action for the recovery of damages for the taking of specified "wildlife * * * that are the property of the state." By referring specifically to wildlife that *are* the property of the state, that statute indicates that some wildlife are *not* the property of the state. ORS 496.705(1) was enacted as part of the same bill as ORS 498.002. *See* Or Laws 1973, ch 723, §§ 23, 73. Thus, in the same bill, the legislature enacted one statute declaring that all wildlife is the property of the state and another recognizing that not all wildlife is the property of the state. That apparent conflict—of which the legislature must have been aware—indicates that "property" means two different things in the two statutes.

The preexisting common-law and statutory framework in which ORS 498.002(1) was enacted indicates that "property," as used in that statute, is not intended to convey that the state has exclusive and perpetual ownership rights in all wildlife. As we explained in our opinion in *Couch*, common-law principles concerning property rights in wildlife stem from the laws of ancient Rome. 196 Or App at 674. "The

Romans classified animals as either *ferae naturae* (of a wild nature) or *domitae naturae* (literally, 'accustomed to the house,' *i.e.*, domesticated)." *Id.* Wild animals were viewed as being held in common by the people. *Id.* at 675. That understanding formed the framework for English common-law game laws. *Id.* at 674. However, the notion that wild animals were held in common by the people became transformed. *Id.* at 675. According to Blackstone, wild animals "belonged not to the people in common but to the King." *Id.*

The view that property rights in wild animals lie in the sovereign was adopted in America, including by the Oregon Supreme Court. *Id.* at 676. In *State v. Hume*, 52 Or 1, 5, 95 P 808 (1908), the court stated,

> "It is a generally recognized principle that migratory fish in the navigable waters of a state, like game within its borders, are classed as animals *ferae naturae*, the title to which, so far as that claim is capable of being asserted before possession is obtained, is held by the state, in its sovereign capacity in trust for all its citizens[.]"

The court explained that the state's "assumed ownership" gave the state authority to regulate the treatment and taking of wildlife. *Id.* at 5-6 ("[A]s an incident of the assumed ownership, the legislative assembly may enact such laws as tend to protect the species from injury by human means and from extinction by exhaustive methods of capture[.]"); *see also State v. Pulos*, 64 Or 92, 95, 129 P 128 (1913) ("[It is a] well-known principle that title to wild game is in the State, and that no person has an absolute property right in game or fish while in a state of nature and at large; that the taking of them is not a right, but is a privilege, which may be restricted, prohibited, or conditioned, as the law-making power may see fit.").

In *Monroe v. Withycombe*, 84 Or 328, 334-35, 165 P 227 (1917), another case involving wild fish, the court expressly stated that the state's sovereign title to animals *ferae naturae* is not a proprietary interest. The court stated that fish are "classified as *ferae naturae*, and while in a state of freedom their ownership, so far as a right of property can

be asserted, is in the state, not as a proprietor, but in its sovereign capacity for the benefit of and in trust for its people in common." *Id.* at 334-35.

Until 1921, the state's property interest in wildlife was not codified. Statutes prohibited hunting, taking, or possessing various animals, but none declared that any wildlife was the property of the state. *See* The Codes and General Laws of Oregon, ch VIII, title II, §§ 1930-1951 (Hill 2d ed 1892). In 1921, the legislature enacted Oregon Code section 39-201, which provided,

> "No person shall at any time or in any manner acquire property in, or subject to his dominion or control, any of the wild game animals, fur-bearing animals, game birds, nongame birds or game fish, or any part thereof, of the state of Oregon, but they shall always and under all circumstances be and remain the property of the state, except that by killing, catching or taking the same in the manner and for the purpose herein authorized and during the period not herein prohibited, the same may be used by any person at the time, and in the manner, and for the purpose herein expressly provided. Any person hunting or trapping for or having in possession any game animals, fur-bearing animals, game birds, nongame birds, or game fish, at any time in any manner shall be deemed to consent that the title shall be and remain in the state for the purpose of regulating the use and disposition of the same, and such possession shall be deemed the consent of such person aforesaid, whether said animals, birds or fish were taken within or without the state."

Oregon Code, title XXXIX, ch II, § 39-201 (1930). Although that statute declared that the specified wild animals "shall always and under all circumstances be and remain the property of the state" and that "[n]o person shall at any time or in any manner acquire property in, or subject [such animals] to his dominion or control," those declarations were qualified by the provision that "title shall be and remain in the state *for the purpose of regulating the use and disposition of the same* * * *." (Emphasis added.) Thus, the statute remained consistent with the common-law view of the state's property interest in wildlife.

In 1933, the statute was amended to add a provision that "any trophy or game animal or bird sold pursuant to a permit of the state game commission shall become the property of the person buying same," Or Laws 1933, ch 174, § 9, further indicating that the state's property interest in wildlife was not absolute.

Our understanding of section 39-201 is confirmed by *Fields v. Wilson*, 186 Or 491, 207 P2d 153 (1949), a case involving a challenge to a program giving certain individuals exclusive rights to trap beaver. In it, the court quoted *Monroe* in stating that "[b]eaver are animals *ferae naturae*, 'and while in a state of freedom their ownership, so far as a right of property can be asserted, is in the state, not as a proprietor, but in its sovereign capacity for the benefit of and in trust for its people in common.' " *Id.* at 498 (quoting *Monroe*, 84 Or at 334-35). It went on to state that beaver "cannot be captured by anyone without express or implied permission of the State. *State v. Hume*, 52 Or [at] 6 * * *. In Oregon the ownership of the State in wild game and fur-bearing animals and the rights of persons therein are thus defined by statute," and set out the full text of section 39-201 (then codified as OCLA section 82-201). *Fields*, 186 Or at 498-99. Plainly, the court viewed the statutory declaration of the state's property interest in wildlife as being consistent with the common-law principle expressed in *Hume* and *Monroe*.

A year later, the court revisited the distinction between sovereign and proprietary ownership of wildlife in *Anthony et al. v. Veatch et al.*, 189 Or 462, 220 P2d 493 (1950), *cert dismissed*, 340 US 923 (1951), another case involving salmon. The plaintiffs in that case challenged the constitutionality of a statute that prohibited taking salmon from the Columbia River using pound nets or fish traps. The defendants cited a Washington Supreme Court case, *State ex rel. Campbell v. Case*, 182 Wash 334, 47 P2d 24 (1935), in support of their position. The plaintiffs "insist[ed] that the Washington court ha[d] adopted an erroneous view of the nature of the state's rights in respect of the regulation of fishing in the navigable streams of the state, and that, for that reason, the Washington decisions [were] not entitled to any weight as authority." *Anthony*, 189 Or at 486. Specifically, the plaintiffs contended that "Washington regards its ownership of fish in

navigable waters, so far as fish, *ferae naturae*, can be said to be the subject of ownership, as being a right of proprietorship, a *jus privatum* rather than *jus publicum*, the latter being a right of sovereignty." *Id.* at 487. The Oregon Supreme Court rejected that argument, stating that "it is clear that the Washington court correctly understands that the state holds title to the fish in its sovereign capacity." *Id.* Thus, the court reiterated that the state's property interest in wildlife is sovereign, not proprietary.

OCLA section 82-201 was recodified as ORS 498.005 in 1953. The statute remained substantively the same until it was repealed in 1973.[6] *See* Or Laws 1973, ch 723, § 130. That year, the legislature repealed that statute and enacted ORS 498.002 as follows: "Wildlife is the property of the state. No person shall angle for, hunt, trap or possess, or assist another in angling for, taking, hunting, trapping or possessing any wildlife in violation of the wildlife laws or of any rule promulgated pursuant thereto." *See* Or Laws 1973, ch 723, § 73.[7] The new statute was enacted as part of an overhaul of the wildlife laws. Although the wording of ORS 498.002 is quite different from that of *former* ORS 498.005, nothing in the new wildlife laws indicates that the legislature intended to alter the understanding of the state's property interest in wildlife. The legislative history confirms that the legislature did not intend a substantive change.

The wildlife statutes enacted in 1973 were introduced by the 1971-72 Interim Committee on Natural Resources. The bill was drafted by a "revision committee" composed of four members, including Deputy Legislative Counsel Chuck Wilson and John McKean, the director of the Game Commission. As the drafting was proceeding, McKean submitted to the Interim Committee a report outlining the

---

[6] In 1971, the statute was amended to replace the words "wild game animals, fur-bearing animals, game birds, nongame birds or game fish" and "animals, birds or fish" with the word "wildlife." Or Laws 1971, ch 658, § 26. There had been no other amendments to the statute since 1933.

[7] In 1993, the statute was amended to add subsection (2), which is not at issue in this case. *See* Or Laws 1993, ch 440, § 1. It was amended again in 2003 to add the words "take" and "taking" to the lists of activities that may not be undertaken in violation of the specified laws. *See* Or Laws 2003, ch 656, § 10. The statute has not otherwise been amended.

proposed "recodification of the Game Code." Oregon State Game Commission, Report to Interim Committee on Natural Resources, May 25, 1972, 1. The report stated that the recodification "is substantially a process of simplification, consolidation, reorganization, and modernization." *Id.* The report noted that there were "a number of substantive changes in the recodification package" but that none of the recommended changes "significantly alter[ed] the authority or powers of the Commission." *Id.*

Later, the revision committee presented the final draft of the proposed legislation to the Interim Committee. In introducing the provisions that would become ORS chapter 498, Chuck Wilson reminded the Interim Committee that "the main theory behind the revision of the law is to simplify the language and consolidate the duplicative where it can be done, and the first section in chapter 498 is an example of that." Tape Recording, Interim Committee on Natural Resources, Aug 31, 1972, Tape 21, Side A (statement of Deputy Legislative Counsel Chuck Wilson). The first section in that chapter is ORS 498.002. Thus, the intent of the drafters of that statute was merely to simplify the language that was previously found in *former* ORS 498.005, not to alter the substance of the law. The Interim Committee voted to introduce the proposed recodification to the 1973 legislature. The provision that became ORS 498.002, section 73 of House Bill 2010 (1973), was passed by the legislature as introduced, without amendment. A written statement by the Game Commission to the House Committee on Agriculture and Natural Resources stated that, in the drafting of the bill, a "sincere effort was made to reduce the number of substantive changes to a minimum and in our estimation this has been accomplished." Oregon State Game Commission, Statement on House Bill 2010, Feb 1, 1973, 1. The statement added, "The basic structure of laws within which the Commission must operate has not been changed. The powers of the Commission would remain basically the same as they are now." *Id.* Nothing in the legislative history indicates that any member of the Legislative Assembly held a different view of section 73 than was held by the bill's drafters.

It follows that, under ORS 498.002(1), "property" continues to have the same meaning that it had in *former*

ORS 498.005. That is, the state's property interest in wildlife is sovereign, not proprietary. It follows, as the presiding officer stated, that "the state's property interest in wildlife under ORS 498.002(1) is not a proprietary or possessory interest that amounts to ownership, as ownership is commonly understood." As we explained in *Couch*, "the idea that the state 'owns' wild game is a legal fiction." 196 Or App at 676 n 5.

In summary, we modify ODFW's ruling only to declare expressly what is implicit in the ruling: that petitioners' animals are the "property of the state," as that phrase is used in ORS 498.002(1). We affirm what is express in the ruling: that the state's property interest in petitioners' animals is not proprietary or possessory, and that the state does not own petitioners' animals in the common sense of "ownership."

Declaratory ruling modified to declare that petitioners' animals are the "property of the state" for purposes of ORS 498.002(1); otherwise affirmed.